IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,866

STATE OF KANSAS,
*Appellee*,

v.

LUQMAN YUSUF KEYS,
*Appellant*.

SYLLABUS BY THE COURT

1.

A criminal prosecution in Kansas generally is started by filing a complaint with a magistrate or by filing an information in the district court. A prosecution also may be started upon the return of an indictment by a grand jury. Once the grand jury returns an indictment, it is filed with the court and the prosecution is deemed to have been begun.

2.

K.S.A. 2020 Supp. 22-3015, which sets forth limited circumstances under which an indictment may be amended, applies only when the State on its own, and without a superseding indictment from a grand jury, seeks to amend an indictment.

3.

The basic elements of procedural due process are notice and the opportunity to be heard at a meaningful time and in a meaningful manner.

4.

A criminal defendant's prior voluntary testimony is admissible at retrial unless it was compelled by the introduction of illegally obtained evidence.

1

5.

A reply brief is reserved for responding to new material in the appellee's brief. An appellant may not raise new issues in a reply brief.

6.

To succeed under a defense of discriminatory or selective prosecution, a defendant must establish (1) the State does not generally prosecute other similarly situated persons for conduct similar to that for which the defendant is being prosecuted and (2) the defendant has been intentionally and purposefully singled out for prosecution on the basis of arbitrary or invidious criteria.

7.

A district court's determination that a witness is unavailable to testify will not be disturbed on appeal absent an abuse of discretion.

8.

An unavailable witness is one who is absent beyond the jurisdiction of the court to compel appearance by its process.

9.

To establish a witness' unavailability, the State must show it acted in good faith and made a diligent effort to find the witness and serve that witness with a subpoena or otherwise secure the witness' attendance at trial. The question of good faith effort turns on the totality of the facts and circumstances of the case.

10.

Under the facts here, before admitting a deposition into evidence at trial, a court must make a finding the witness is (1) unavailable because the witness is out of the state and his or her appearance cannot be obtained, unless the offering party procured the witness' absence, or (2) the offering party is unable to procure the attendance of the witness by subpoena or other process.

11.

An appellant may not raise new legal issues in a reply brief. K.S.A. 60-404.

12.

An appellate court reviews issues of alleged jury instruction error to determine whether the instruction is both legally and factually appropriate.

13.

Self-defense is never a defense to felony murder. A self-defense instruction may be given only in felony-murder cases if it may negate an element of the underlying inherently dangerous felony.

14.

Self-defense is a legal justification for the use of force in defense of oneself or another. Given this, a self-defense instruction is not legally appropriate when the defendant is charged with a crime that does not include an element legally justified by the use of force in defense of oneself or another.

15.

Criminal distribution or possession of a controlled substance with intent to distribute described in K.S.A. 2020 Supp. 21-5705 includes no element that could be

3

justified by using force in defense of oneself or another, and therefore cannot be negated by a claim of self-defense.

16.

The crime of aggravated robbery described in K.S.A. 2020 Supp. 21-5420 includes no element that could be justified by using force in defense of oneself or another, and therefore cannot be negated by a claim of self-defense.

17.

A defendant may not assert self-defense if the defendant already is attempting to commit, committing, or escaping from the commission of a forcible felony.

18.

Cumulative error doctrine does not apply if no error supports reversal.

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed June 3, 2022. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, argued the cause, and was on the briefs for appellant.

*Natalie Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the briefs for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.:  A jury convicted Luqman Yusuf Keys of felony murder and aggravated robbery. On direct appeal, Keys argues the indictment forming the basis of his conviction was statutorily and constitutionally defective. Keys also claims the district

4

court erred in several respects: in denying his motion to dismiss based on selective prosecution, in declaring a witness unavailable to testify at trial, and in refusing to instruct the jury on self-defense. Finally, Keys contends the cumulative effect of these errors violated his constitutional right to a fair trial. Based on the analysis set forth below, we affirm Keys' convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On June 25, 2017, Keys went to Cole Gilbert's apartment in Topeka to buy marijuana. Arden King, an acquaintance of Keys who had set up the meeting, also was present. Keys was armed with a gun and fatally shot King during the attempted drug deal. An autopsy revealed King's cause of death was a gunshot wound to the chest.

A grand jury indicted Keys on charges of felony murder, aggravated robbery, and aggravated burglary. The indictment alleged aggravated robbery and aggravated burglary as alternative underlying felonies to support the felony-murder charge. The grand jury later issued a superseding indictment, which added a charge of criminal possession of a firearm. Keys entered a no contest plea to the firearm charge.

The case proceeded to trial on the remaining charges, where the jury heard conflicting testimony about the events leading to King's death. Gilbert testified he used King as an intermediary to contact Keys on his behalf. Gilbert and Keys arranged for the drug transaction to occur outside Gilbert's apartment. Gilbert denied giving Keys permission to come inside his apartment. Gilbert and King were outside when Keys arrived with an unidentified Black male. After King went inside to get the marijuana, Keys asked if Gilbert had a scale. When Gilbert went to get the scale, Keys and the unidentified male followed Gilbert inside the apartment, so Gilbert assumed the drug sale would take place there. Gilbert and King sat down on the couch, and Gilbert placed a bag

5

of marijuana on the scale. According to Gilbert, Keys pulled a gun out of his pocket and pointed it at Gilbert and King. Gilbert testified King stood up and said, "'Really? Is this necessary?'" Pointing the gun at King, Keys responded, "'You really don't think I won't shoot you,'" and called him a "bitch" before shooting him close to a minute later. Gilbert claimed that after the shooting, Keys and the other male took everything off a nearby table, including the marijuana and a jar containing about $76, before running from the apartment. Gilbert denied that any confrontation or argument occurred before the shooting.

Keys presented a different account of the incident. Keys testified King contacted him about buying marijuana from Gilbert. Keys later communicated with Gilbert on Facebook Messenger and agreed to buy 14 grams of marijuana for $140. Keys said an acquaintance named Chris came with him to Gilbert's apartment because Keys had agreed to sell Chris some of the marijuana Keys planned to purchase. Keys said when they arrived at the apartment building, Gilbert and King were waiting outside. Keys testified he brought a gun with him because he did not know Gilbert. Keys claimed that when he lifted his shirt to pay for the marijuana, Gilbert saw the gun and showed interest in buying it. Keys said he did not want to display his gun outside, so he went inside the apartment with Gilbert and King while Chris remained outside. Keys said that once inside the apartment, King and Gilbert sat down on a couch in the living room, while Keys stood on the other side of a small table in front of the couch. Keys testified he and Gilbert discussed how much the gun was worth, and he pulled out the gun to show it worked. Keys said when he pulled the slider back, it got caught on the safety. According to Keys, King then stood up and came toward him with a raised fist, so Keys pulled the trigger and shot King. Keys denied that he intended to kill King. Although King did not have a weapon, Keys noted he was outnumbered by King and Gilbert and claimed he was scared when he saw King advance toward him. Keys said that after shooting King, he immediately left the apartment. Keys denied stealing any marijuana or cash and denied

6

that he intended to rob Gilbert or break into Gilbert's apartment. Keys claimed he only went there to buy marijuana. Keys admitted that possessing marijuana was a crime.

The jury acquitted Keys of aggravated burglary and did not reach a verdict on the felony murder and aggravated robbery charges. As a result, the district court declared a mistrial on those counts.

After the mistrial, the grand jury issued a second superseding indictment that modified the felony-murder charge by adding the commission of another alternative underlying felony on which the felony-murder charge could be based: distributing or possession with intent to distribute a controlled substance.

The case went to trial for a second time, where Gilbert presented essentially the same testimony as he did at the first trial. This time, Keys did not testify so the State requested permission to introduce a transcript of his testimony from the first trial. Over defense counsel's objection, the district court permitted the transcript to be introduced into evidence, and the State had Keys' testimony from the first trial read into the record.

In this second trial, the jury convicted Keys of felony murder and aggravated robbery. At sentencing, the district court imposed a hard 25 life sentence for felony murder, a consecutive 94-month sentence for aggravated robbery, and a concurrent 8-month sentence for criminal possession of a firearm. Keys filed this timely appeal.

ANALYSIS

Keys raises five issues on appeal: (1) The second superseding indictment was statutorily and constitutionally defective, (2) the district court erred in denying his motion to dismiss for selective prosecution, (3) the district court erred in declaring a witness

7

unavailable to testify at trial, (4) the district court erred in refusing to instruct the jury on self-defense, and (5) the cumulative effect of these alleged errors deprived him of his constitutional right to a fair trial. We address each issue in turn.

1. *The second superseding indictment*

Keys argues the second superseding indictment was defective in two respects. First, he contends the State lacked statutory authority under K.S.A. 2020 Supp. 22-3015 to amend the indictment. Second, Keys claims the second superseding indictment violated his constitutional right to due process by adding another underlying felony of distributing or possessing with intent to distribute a controlled substance. Keys also makes a separate argument that the second superseding indictment violated the statutory and constitutional prohibition against double jeopardy. The State responds that Keys failed to preserve these arguments for appeal and that they otherwise fail on the merits.

*Preservation*

Before we can address the substance of Keys' arguments, we first must consider whether he preserved them for appeal.

After the grand jury issued the second superseding indictment, the State filed a motion asking permission to introduce into evidence Keys' testimony from the first trial, citing multiple exceptions to the rule prohibiting admission of hearsay testimony. See K.S.A. 60-459; K.S.A. 2020 Supp. 60-460. Keys objected to the State's motion, challenging the admission of his prior testimony on grounds it was irrelevant to the charges in the second superseding indictment. Keys also objected on grounds that the State's use of his prior testimony would violate his constitutional right to due process. Keys argued he was unaware when he testified at the first trial that his testimony would

8

provide a basis for the State to retry him for felony murder under a new theory based on his intent to distribute marijuana. In support of his due process objection, Keys alleged his testimony was not knowing or voluntary, and its admission would render his trial counsel ineffective for allowing him to testify in a manner the State could use against him. After considering written and oral argument from the parties, the district court granted the State's motion to admit Keys' prior testimony.

This procedural history reflects that Keys sought to prevent the State from introducing his testimony from the first trial into evidence at the second trial. Yet nothing in the record establishes Keys ever challenged the State's authority to obtain the second superseding indictment or otherwise raised a constitutional due process argument about proceeding with the amended charges in the second superseding indictment. Generally, issues not raised before the district court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). This general rule includes constitutional grounds for reversal asserted for the first time on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). A defendant should first challenge a charging document in the district court. A defendant who fails to challenge a charging document in the district court must establish on appeal that an exception to the preservation rule should be applied. *State v. Dunn*, 304 Kan. 773, 819, 375 P.3d 332 (2016); see *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020) (setting forth exceptions to the preservation rule an appellate court may invoke in its discretion).

While Keys does not directly acknowledge he is raising new issues on appeal, he nevertheless suggests we have discretion to review his arguments under recognized exceptions to the preservation rule. Keys relies on the following exceptions allowing a party to raise an argument for the first time on appeal: (1) if it presents only a question of law and is finally determinative of the case or (2) if consideration of the issue is

9

necessary to serve the ends of justice or to prevent the denial of fundamental rights. See *Harris*, 311 Kan. at 375.

Under the first exception, Keys argues that whether the State can amend an indictment under K.S.A. 2020 Supp. 22-3015 is a purely legal issue. But whether resolution of this issue would be finally determinative of the case is questionable. Even if we were to rule in Keys' favor on this issue, the original felony-murder charge alleging aggravated robbery as the basis for the underlying felony—which Keys does not challenge—remains.

As for the second exception to the preservation rule, Keys asserts the amendments in the second superseding indictment deprived him of a fair trial; thus, our consideration of this issue is necessary to prevent the denial of his fundamental due process rights. See *State v. McBride*, 307 Kan. 60, 69, 405 P.3d 1196 (2017) ("'The right to a fair trial is a fundamental liberty secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.'"). We use our discretion to review Keys' arguments under the fundamental rights exception to the preservation rule.

*Second superseding indictment*

The grand jury issued three indictments: (1) the original indictment, (2) the superseding indictment that added the criminal possession of a firearm charge, and (3) the second superseding indictment that modified the felony-murder charge by adding distributing or possessing with intent to distribute a controlled substance as an alternative underlying felony. Keys claims the State lacked authority to amend the indictment under K.S.A. 2020 Supp. 22-3015. But Keys' claim fails as it relies on the faulty assertion that the grand jury issuing a second superseding indictment after a mistrial is equivalent to the State seeking to amend the indictment.

10

A charging document is a written instrument and can involve questions of statutory interpretation, both of which are subject to unlimited review. *Dunn*, 304 Kan. at 819; see *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019) (interpretation of statute presents question of law over which appellate courts have unlimited review); *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016) (interpretation and legal effect of written instruments involve matters of law over which appellate courts exercise unlimited review).

Our standards when reviewing statutes are well known. The most fundamental rule of statutory interpretation is that the Legislature's intent governs if we can ascertain that intent. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019).

We begin our analysis with a brief discussion of the indictment process. In Kansas, a criminal prosecution generally begins by filing a complaint with a magistrate or by filing an information in the district court. See K.S.A. 22-2301 (complaint); K.S.A. 22-2303 (information). A prosecution also may begin upon the return of an indictment by a grand jury. The grand jury process in Kansas is governed by K.S.A. 2020 Supp. 22-3001 et seq. Once the grand jury returns an indictment, it is filed with the court and the prosecution "shall be deemed to have been begun." K.S.A. 22-2303(1).

Historically, Kansas statutes did not allow the amendment of an indictment. K.S.A. 22-3201(a) provides: "Prosecutions in the district court shall be upon complaint,

11

indictment or information." The statute also allows the court to "permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." K.S.A. 22-3201(e). But the statute, which is based on Rule 7 of the Federal Rules of Criminal Procedure, was silent on the amendment of indictments. See *State v. Carpenter*, 228 Kan. 115, 118, 612 P.2d 163 (1980) ("'The federal courts continue to adhere to the historic rule that an indictment may not be amended. The reason is clear. An indictment is an action of the grand jury, and the prosecutor or court may not change the charge put forward by the grand jury.'") (quoting 1 Wright, Federal Practice and Procedure: Criminal § 127).

In 2013, however, the Legislature enacted K.S.A. 22-3015 to allow the amendment of indictments. See L. 2013, ch. 85, § 16. The current version of the statute sets forth the limited circumstances under which amendment may occur:

"(a) *Matters of form, time, place, names*. At any time before or during trial, the court may, upon application of the prosecuting attorney and with notice to the defendant and opportunity for the defendant to be heard, order the amendment of an indictment with respect to defects, errors or variances from the proof relating to matters of form, time, place and names of persons when such amendment does not change the substance of the charge, and does not prejudice the defendant on the merits. Upon ordering an amendment, the court, for good cause shown, may grant a continuance to provide the defendant adequate opportunity to prepare a defense.

"(b) *Prohibition as to matters of substance, exception*.

(1) An indictment shall not be amended as to the substance of the offense charged, except as provided further.

12

(2) The court may, upon application of the prosecuting attorney and with notice to the defendant and opportunity for the defendant to be heard, order the substance of an indictment to be amended for the limited purpose of effecting a change of plea by the defendant pursuant to a plea agreement reached between the defendant and the prosecuting attorney." K.S.A. 2020 Supp. 22-3015.

Keys argues the State lacked authority under K.S.A. 2020 Supp. 22-3015 to amend the indictment here because the second superseding indictment changed the substance of the felony-murder charge by adding a new alternative underlying felony. But Keys' argument rests on a flawed premise: that the prosecuting attorney asked the court to amend the indictment without grand jury involvement. That is not what happened. Here, the State presented the grand jury with recently discovered additional evidence and, after considering that new evidence, the grand jury returned a second superseding indictment that included a new charge. See K.S.A. 22-2303(1) ("When an indictment is returned . . . a prosecution shall be deemed to have been begun."). The second superseding indictment was not the product of the prosecuting attorney seeking permission from the court to amend "the substance of the offense charged" in the original or first superseding indictment. Instead, the grand jury issued a new, second superseding indictment based on new evidence the State presented to it. Thus, contrary to Keys' assertion, the second superseding indictment issued by the grand jury does not implicate K.S.A. 2020 Supp. 22-3015.

*Due process*

Keys also asserts a violation of his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Keys claims the second superseding indictment deprived him of the opportunity to defend himself against the felony-murder charge because he did not know the State would use his testimony from the first trial to allege a new underlying

13

felony. We exercise unlimited review when determining whether an individual's right to due process has been violated. *Johnson v. State*, 289 Kan. 642, 649, 215 P.3d 575 (2009).

The basic elements of procedural due process are notice and "the opportunity to be heard at a meaningful time and in a meaningful manner." *In re Care & Treatment of Ellison*, 305 Kan. 519, 526, 385 P.3d 15 (2016). Relevant here, "[t]he purpose of an indictment, information or complaint is to advise the accused and the court of the charges alleged to have been committed and the essential facts constituting the crime or crimes charged." *Carpenter*, 228 Kan. at 120.

The second superseding indictment, filed on September 21, 2018, put Keys on notice that he would need to defend against a charge of felony murder with the alternative underlying felonies of aggravated robbery and distributing or possessing with intent to distribute a controlled substance. At a hearing on September 26, 2018, the district court informed Keys the grand jury had issued a second superseding indictment and advised him of the charges in it, including the felony-murder charge with a new underlying felony of distributing or possessing with intent to distribute a controlled substance. Keys declined to have the charges read to him and advised the court he understood the new charge and had discussed it with his attorney. The State later moved to admit Keys' testimony from the first trial. Based on these facts, we reject the notion that Keys was surprised as to the nature of the charges in the second superseding indictment. At the second trial, Keys had a chance to defend himself against those charges. Because Keys was provided both with notice of the charges set forth in the second superseding indictment and the opportunity to defend himself against those charges, his due process argument necessarily fails.

To the extent that Keys is challenging the State's use of his prior testimony at the second trial, we have long recognized that a criminal defendant's prior voluntary

testimony is admissible at retrial unless it was compelled by introducing illegally obtained evidence. *Harrison v. United States*, 392 U.S. 219, 222, 88 S. Ct. 2008, 20 L. Ed. 2d 1047 (1968); *State v. Willcox*, 240 Kan. 310, 312-13, 729 P.2d 451 (1986). Keys does not allege his prior testimony was involuntary or improperly compelled. And he provides no authority to support his assertion that the State is constitutionally prohibited from relying on his prior testimony to support a charge in the second superseding indictment. Keys therefore has abandoned this issue. See *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (failure to support a point with pertinent authority or show why it is sound despite lack of supporting authority is akin to failing to brief issue).

*Double jeopardy*

For the first time in his reply brief, Keys argues his prosecution under the second superseding indictment was improper under K.S.A. 2020 Supp. 21-5110, the statutory codification of the constitutional guarantees against double jeopardy.

Kansas Supreme Court Rule 6.05 (2021 Kan. S. Ct. R. 37) provides that a reply brief is reserved for responding to new material in the appellee's brief. An appellant may not raise new issues in a reply brief. *State v. McCullough*, 293 Kan. 970, 984-85, 270 P.3d 1142 (2012) ("'A reply brief is an inappropriate vehicle for raising additional issues.'"). An argument asserted for the first time in a reply brief does not conform to Rule 6.05. For these reasons, we decline to address the double jeopardy issue.

2. *Motion to dismiss*

Keys argues the district court erred in denying his motion to dismiss the second superseding indictment, which he alleges was based on selective prosecution. He claims

15

the State unfairly targeted him for prosecution because he is Black, thereby violating his constitutional right to equal protection.

When reviewing a district court's decision to deny a motion to dismiss, the standard of review is determined by the ground on which dismissal was sought. *State v. Garcia*, 282 Kan. 252, 259, 144 P.3d 684 (2006). Before trial, Keys moved to dismiss the felony-murder charge for discriminatory and selective prosecution. Keys alleged the State's decision to prosecute him for felony murder under a theory of distributing or possessing with intent to distribute a controlled substance was discriminatory and unconstitutionally selective based on his race. Whether the State pursued prosecution in violation of the defendant's constitutional rights is a question of law. We exercise unlimited review over a district court's denial of a motion to dismiss on pure legal grounds. 282 Kan. at 260.

The defense of discriminatory or selective prosecution arises under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *State ex rel. Murray v. Palmgren*, 231 Kan. 524, Syl. ¶ 1, 646 P.2d 1091 (1982); *State v. Robinson*, 55 Kan. App. 2d 464, 467, 417 P.3d 1087 (2018). To succeed with this defense, a defendant must establish (1) the State generally does not prosecute other similarly situated persons for conduct similar to that for which the defendant is being prosecuted and (2) the defendant "has been intentionally and purposefully singled out for prosecution on the basis of arbitrary or invidious criteria." *State v. Gant*, 288 Kan. 76, 85, 201 P.3d 673 (2009), *overruled on other grounds by State v. Sampson*, 297 Kan. 288, 301 P.3d 276 (2013). A defendant cannot satisfy his or her burden based on speculation alone; there must be evidence in the record to support the claim. *Gant*, 288 Kan. at 85; see *United States v. Armstrong*, 517 U.S. 456, 463, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (noting the standard for proving a selective prosecution claim "is a demanding one");

16

*United States v. DeBerry*, 430 F.3d 1294, 1299 (10th Cir. 2005) (emphasizing high standard of proof required to succeed on claim of selective prosecution).

To determine whether a defendant has established a basis to dismiss a complaint or indictment for selective prosecution, courts begin by recognizing the State enjoys broad discretion in making prosecutorial decisions. See *United States v. Pottorf*, 828 F. Supp. 1489, 1498-99 (D. Kan. 1993); *Murray*, 231 Kan. at 528 ("The discretion whether or not to prosecute has long been the sacred domain of the prosecutor."). But "[such] discretion is 'subject to constitutional constraints.'" *Armstrong*, 517 U.S. at 464. "[T]he decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" 517 U.S. at 464. Mere failure to enforce the law against other violators does not establish a claim of discriminatory prosecution. *Murray*, 231 Kan. at 529; *Gladen v. State*, 196 Kan. 586, 590, 413 P.2d 124 (1966).

At a hearing on the motion to dismiss, Keys noted the State declined to file charges against Gilbert, who is White, for his involvement in the drug transaction that led to King's death. Claiming the only difference between them is their race, Keys alleged the State's failure to prosecute Gilbert established a prima facie case of selective prosecution based on race. The prosecutor argued Keys' motion was untimely and otherwise failed on the merits. The prosecutor denied that the State's decision to prosecute Keys had anything to do with his race. Instead, the prosecutor claimed the State brought charges against Keys based on his actions of bringing a gun to the drug transaction and killing King. The prosecutor also noted Keys' criminal history included a prior adjudication for attempted aggravated robbery.

After considering the parties' written and oral arguments, the district court denied Keys' motion to dismiss. The court found that even if the motion had been filed timely, Keys failed to make a prima facie case he was being prosecuted because of his race. The

17

court adopted the State's argument, noting that Keys, not Gilbert, had brought a gun to the drug transaction and that Keys' criminal history was more significant and included a prior attempted aggravated robbery adjudication.

While the parties do not address the timeliness issue, we note Keys' motion was, indeed, untimely filed. K.S.A. 2020 Supp. 22-3208(4) provides that a motion to dismiss must be made "within 21 days after the plea is entered." But the State does not challenge the timeliness of Keys' motion, so we may consider this issue waived. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (an issue not briefed is deemed waived or abandoned).

Turning to the substance of Keys' argument, he challenges the district court's finding that he did not present a prima facie case of selective prosecution. As support for his claim, Keys alleges Gilbert equally was implicated under the State's theory of felony murder pursued in the second superseding indictment yet was treated "dramatic[ally]" different than Keys. Keys characterizes the State's case against him as weak, noting it took multiple indictments and two trials to obtain convictions. Keys claims that although he was just a willing participant in a drug deal and the victim of an attempted robbery, the State went to great lengths to pursue "a scorched earth campaign of maximalist prosecution," while declining his offers to plead guilty to second-degree murder and opposing his motion for concurrent sentencing. In contrast, the State sought no punishment for Gilbert—who, according to Keys, instigated the events leading to King's death by soliciting Keys as a customer. Given Gilbert's participation in the drug transaction, Keys claims the State could have charged Gilbert with felony murder as an aider and abettor or charged him with various drug crimes. Speaking to their differences in criminal history, Keys argues Gilbert cannot accumulate criminal history if he is never prosecuted for any crimes.

18

Keys' selective prosecution claim is unsupported by the record. As discussed, to succeed on this claim, Keys was required to establish (1) the State generally does not prosecute other similarly situated persons for conduct similar to that for which he is being prosecuted and (2) he "has been intentionally and purposefully singled out for prosecution on the basis of arbitrary or invidious criteria." See *Gant*, 288 Kan. at 85.

Keys has failed to establish that others similarly situated have not been prosecuted for similar conduct. Although the State did not prosecute Gilbert for any crimes, he was hardly similarly situated to Keys. Gilbert admittedly agreed to sell marijuana to Keys, but it was Keys, not Gilbert, who brought a gun to the meeting and shot King. And Keys had a criminal history that included a prior attempted aggravated robbery adjudication which prevented him from legally possessing the gun he ultimately used to kill King. Gilbert's criminal history is not included in the record, but Keys makes no argument on appeal that it was comparable to his. These are additional factors the State may consider in deciding whether to prosecute.

Nor is there any evidence to suggest the State singled Keys out based on some arbitrary or invidious criteria. "By invidious, we generally mean that the State has discriminated based on some improper characteristic, such as race, religion, national origin, or sex. . . . As for arbitrariness, 'a prosecutor's enforcement classification is "arbitrary" only if "people have been classified according to criteria which are clearly irrelevant to law enforcement purposes."' [Citations omitted.]" *Robinson*, 55 Kan. App. 2d at 469. Keys' speculative and conclusory assertion that the State chose to prosecute him based on his race ignores the fact that Keys was solely responsible for killing King. That the State chose to prosecute Keys, and not Gilbert, was neither arbitrary nor invidious.

19

Keys alternatively recommends we adopt a new burden-shifting test to evaluate selective prosecution claims. He proposes a test requiring the State to overcome proof of a prima facie case of selective prosecution by presenting good cause for its prosecutorial decisions and showing its actions were not substantially motivated by a discriminatory intent. Keys suggests such a test is proper under the Kansas Constitution and is necessary to remedy the disparities in the criminal justice system given our country's history of disproportionately policing and incarcerating minorities. But we decline Keys' invitation to adopt a new test for selective prosecution claims. The current test, requiring a credible threshold showing of disparate treatment of similarly situated persons, "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Armstrong*, 517 U.S. at 470.

In sum, Keys and Gilbert were not similarly situated under these facts and the district court did not err in denying Keys' motion to dismiss.

3. *Unavailability of witness to testify at trial*

Next, Keys challenges the district court's decision to admit into evidence the deposition testimony of Dr. Charles Glenn after finding he was unavailable to testify at trial. Keys raises two arguments:  First, he objects to the district court's finding of unavailability under K.S.A. 60-459(g). Second, he claims Dr. Glenn's absence at trial violated his right to confrontation under the United States and Kansas Constitutions. In response, the State argues Dr. Glenn was unavailable and that his deposition testimony was properly admitted at trial. The State objects to our consideration of the constitutional issue because Keys did not object on this basis below. Alternatively, the State contends Keys' constitutional argument otherwise fails on the merits.

20

The following additional facts are relevant to this issue. Dr. Glenn, the Shawnee County coroner who performed King's autopsy, testified at Keys' first trial. Before the second trial, the State moved to depose Dr. Glenn under K.S.A. 22-3211(4), alleging he was an essential witness because his testimony was necessary to establish the cause and manner of King's death. The State alternatively moved to introduce Dr. Glenn's testimony from the first trial. The State advised Dr. Glenn likely would be unavailable to testify at Keys' trial because he was relocating to New Zealand the week before the trial was scheduled to begin. Given Dr. Glenn's unavailability, the State requested admission of Dr. Glenn's testimony from the first trial if he could not be deposed before leaving the country.

Keys objected to both procedures, arguing he would be prejudiced if Dr. Glenn did not appear in person at trial. Keys claimed Dr. Glenn's testimony was essential to the defense; specifically, his testimony relating to the close range from which Keys fired the gun. Keys proposed rescheduling the trial date to occur before Dr. Glenn left for New Zealand.

Noting its full calendar before the scheduled trial date, the district court advised it would be impossible to reschedule. The court then found Dr. Glenn was an essential witness under K.S.A. 22-3211(4) and authorized the State to conduct a videotaped deposition in Keys' presence.

Dr. Glenn's deposition took place on November 5, 2018. On the third day of trial, November 28, 2018, the State filed a motion requesting the district court to find Dr. Glenn was unavailable to testify and to admit the video and transcript of his deposition testimony. In support of its efforts to secure Dr. Glenn's testimony, the State presented the following testimony from Theresa Peters, the lead investigator for the Shawnee County District Attorney's Office. On September 28, 2018, the district attorney's office

21

issued a subpoena for Dr. Glenn to appear at Keys' trial. Dr. Glenn acknowledged receipt of the subpoena. At the November 5th deposition, Dr. Glenn advised November 15 was his last day as the Shawnee County Coroner, and he was leaving for New Zealand on November 24 to start a new job there. Dr. Glenn, in his capacity as coroner, was a witness in several other Shawnee County homicide cases and had often been deposed because he was unable to attend every trial. Dr. Glenn advised he would be willing to return to the United States, at the State's expense, for any trials for which he was a witness. But Dr. Glenn said he would be unable to return for Keys' trial because he was scheduled to start his new job as a coroner in New Zealand the week of November 26, 2018, when Keys' trial was set to begin. On November 27, the day after Keys' trial had started, Peters emailed Dr. Glenn to advise the trial was underway and asked if he could testify in person. Dr. Glenn responded he was in New Zealand and would be unable to do so. Besides this email, Peters also spoke personally with Dr. Glenn regarding his inability to attend the trial.

On cross-examination, defense counsel elicited testimony from Peters that Dr. Glenn had agreed to testify remotely through telecommunication, but Peters advised the district attorney's office did not have the equipment necessary for remote testimony. Peters agreed this equipment existed but said she had not personally investigated whether remote testimony would be a possibility for any trials. Peters testified on redirect that the State intended to have Dr. Glenn testify remotely in the future, but it had not yet been able to locate someone in New Zealand who could administer an oath.

Given the State's reasonable efforts to procure Dr. Glenn's attendance at trial, as well as its inability to conduct remote testimony, the prosecutor argued Dr. Glenn should be declared unavailable under K.S.A 60-459(g)(4). In response, defense counsel challenged the State's assertion that Dr. Glenn was truly unavailable. Counsel claimed Dr. Glenn did not directly state he could not return for the trial and noted the State had made

no effort to secure his remote testimony. After considering the evidence and argument from counsel, the district court found Dr. Glenn was unavailable and admitted his deposition testimony video and transcript into evidence. The judge reasoned,

"[Dr. Glenn] is not here. Other arrangements were made to obtain his testimony through the deposition. He certainly is not here.

"With regard to the—I'm not saying it can't be done and hasn't been done, but I've certainly not had a trial where an individual has testified through telecommunication. Everybody talks about Skype and there's times, Skype is a nightmare and sometimes Skype is wonderful. I don't know what the availability or connectivity would have been whether it be through Skype or some other telecommunications' issue."

*K.S.A. 60-459(g)(4)*

A district court's determination that a witness is unavailable to testify will not be disturbed on appeal absent an abuse of discretion. *State v. Flournoy*, 272 Kan. 784, 799, 36 P.3d 273 (2001); *State v. Zamora*, 263 Kan. 340, 342, 949 P.2d 621 (1997). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

K.S.A. 60-459(g)(4) provides that an unavailable witness is "absent beyond the jurisdiction of the court to compel appearance by its process." Before admitting a deposition into evidence at trial, a court must make a finding that the witness is unavailable for any one of four reasons identified in K.S.A. 22-3211(8). Relevant here, a witness' deposition may be used at trial if (1) the witness is out of the state and his or her

23

appearance cannot be obtained, unless the offering party procured the witness' absence; or (2) the offering party is unable to procure the attendance of the witness by subpoena or other process. K.S.A. 22-3211(8)(b), (8)(d); see K.S.A. 2020 Supp. 60-460(c)(1) (hearsay exception allowing introduction at trial of an unavailable witness' deposition testimony taken in compliance with K.S.A. 22-3211).

To establish a witness' unavailability under K.S.A. 60-459, the State must show it acted in good faith and made a diligent effort to find the witness and serve that witness with a subpoena or otherwise secure the witness' attendance at trial. See *State v. Plunkett*, 261 Kan. 1024, 1034, 934 P.2d 113 (1997). "The question of good faith effort turns on the totality of the facts and circumstances of the case." *Flournoy*, 272 Kan. at 800.

Keys argues the State failed to establish Dr. Glenn was truly unavailable. He claims the State failed to act with due diligence to secure Dr. Glenn's live testimony and instead simply accepted he would not be present. Keys contends that issues relating to the State's ignorance of the logistics involved with remote testimony or its inability to find someone to administer the oath in New Zealand are irrelevant to whether Dr. Glenn was unavailable.

The United States Supreme Court has found that a witness who resides in a foreign country is necessarily unavailable. *Mancusi v. Stubbs*, 408 U.S. 204, 212, 92 S. Ct. 2308, 33 L. Ed. 2d 293 (1972) ("Upon discovering that [the witness] resided in a foreign nation, the [s]tate of Tennessee, so far as this record shows, was powerless to compel his attendance at the second trial, either through its own process or through established procedures depending on the voluntary assistance of another government."). Other jurisdictions have held the State does not meet its burden of proving reasonable efforts to produce a witness for trial merely by establishing the witness resides outside the United States and outside the state's subpoena powers. Rather, the State must try to determine

24

whether the witness might voluntarily return to the jurisdiction for trial. See *Commonwealth v. Hunt*, 38 Mass. App. Ct. 291, 295, 647 N.E.2d 433 (1995) (relying on *Mancusi* for proposition that "[w]hen a witness is outside of the borders of the United States and declines to honor a request to appear as a witness, the unavailability of that witness has been conceded because a [s]tate of the United States has no authority to compel a resident of a foreign country to attend a trial here"); *cf. State v. Hassapelis*, 620 A.2d 288, 289, 292-93 (Me. 1993) (finding efforts insufficient to establish unavailability where State did not ask Canadian witness if he was available to attend trial, did not serve him with a subpoena, and presented no evidence showing the witness was unavailable).

The record reflects the State subpoenaed Dr. Glenn on September 28, 2018. At the deposition on November 5, Dr. Glenn advised he could not attend Keys' trial scheduled for the week of November 26 because he could not miss the first day of the first week of his new job in New Zealand. Peters testified she kept in contact with Dr. Glenn after he moved and emailed him on November 27 to find out if he could return to the United States for Keys' trial. Dr. Glenn responded he was in New Zealand and would be unable to do so.

Keys provides no persuasive authority to show that reasonable and good-faith efforts under these circumstances necessarily required the State to take any additional steps beyond those it pursued. Although the State did not try to secure Dr. Glenn's remote testimony, the State need not exhaust all possible means to satisfy its burden of establishing a witness' unavailability. See *State v. Alderice*, 221 Kan. 684, 686-87, 561 P.2d 845 (1977) (measure of State's effort is one of reasonable diligence). At the time of Keys' trial, use of remote testimony was uncommon; the district court noted it had never taken place there.

Under the totality of the circumstances present here, the State made sufficient efforts—including issuing a subpoena and asking whether he would return voluntarily at the State's expense—to establish Dr. Glenn's unavailability under K.S.A. 60-459(g)(4). The district court did not abuse its discretion in finding these efforts permitted the use of Dr. Glenn's deposition testimony in place of his appearance as a live witness at Keys' trial.

*Constitutional confrontation rights*

As part of his challenge to the district court's finding of unavailability, Keys argues the admission of Dr. Glenn's deposition testimony at trial violated his right to confront witnesses under the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.

The State correctly points out Keys did not frame his objection to the admission of Dr. Glenn's testimony as a constitutional confrontation issue. In opposition to the State's motions to either depose Dr. Glenn or introduce his testimony from the first trial, Keys argued he would be prejudiced if Dr. Glenn did not appear in front of the jury because his testimony was essential to the defense. And at trial, Keys argued only that the State had failed to establish that Dr. Glenn was unavailable under K.S.A. 60-459(g)(4). Keys did not object when the video of Dr. Glenn's deposition testimony was played for the jury.

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. King*, 288 Kan. 333, 341-42, 204 P.3d 585 (2009) (explaining purpose behind contemporaneous-objection rule of K.S.A. 60-404); see *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014) (issues not raised before the trial court may not be raised on appeal). And a party may not object at trial to the admission of evidence on one ground and then

26

on appeal argue a different ground. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016) (by only objecting based on relevance at trial, defendant waived claim the evidence was unduly prejudicial).

There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal. *Harris*, 311 Kan. 371, Syl. ¶ 1 (setting forth exceptions to the preservation rule an appellate court may invoke in its discretion). Notably, Keys did not argue in his initial brief that any exception existed to permit his challenge to be addressed for the first time on appeal. Although he did make the argument in his reply brief, an appellant may not raise new legal issues in a reply brief. *State v. McCullough*, 293 Kan. 970, 984, 270 P.3d 1142 (2012). Thus, the confrontation claim was not preserved for appeal. K.S.A. 60-404; *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009) ("[*State v. King*, 288 Kan. 333, 204 P.3d 585 (2009)] affirmed this court's prior treatment of failures to object to evidence under K.S.A. 60-404, even where constitutional rights were at stake. See, e.g., *State v. Mays*, 277 Kan. 359, 384-85, 85 P.3d 1208 [2004] [defendant's failure to timely object to alleged hearsay statements precludes defendant from raising issue on appeal, even where alleging violation of Confrontation Clause of Sixth Amendment to United States Constitution].")

4. *Jury instruction on self-defense*

Keys argues the district court committed reversible error in refusing to instruct the jury on self-defense. He claims the court's failure to do so violated several of his constitutional rights, including his right to present a defense. Keys also suggests that when a self-defense instruction is given, a defendant is entitled to jury instructions on imperfect self-defense voluntary manslaughter and imperfect self-defense involuntary manslaughter.

27

*Standard of review*

We review allegations of jury instruction error under a three-step process: (1) whether we can or should review the issue, that is, whether there is a lack of appellate jurisdiction or whether there was a failure to preserve the issue; (2) whether an error occurred; and (3) whether any error found requires reversal. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

The first and third step are interrelated: the standard of review for reversibility at the third step depends on whether a party has preserved the jury instruction challenge in the first step. 307 Kan. at 317; see K.S.A. 2020 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). At the second step, we consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Gray*, 311 Kan. 164, 173, 459 P.3d 165 (2020). To be factually appropriate, there must be sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

Under the first step, Keys requested a self-defense instruction, thus preserving this issue for appellate review.

Moving on to the second step of the analysis, we must determine whether the instruction was legally and factually appropriate. See *McLinn*, 307 Kan. at 318. We first discuss the legal propriety of an instruction because if the instruction is not legally

appropriate, "there is no error in failing to give it and the analysis ends." *State v. Roberts*, 314 Kan. 835, 847, 503 P.3d 227 (2022).

At trial, the State argued a self-defense instruction was not legally appropriate under K.S.A. 2020 Supp. 21-5226(a), which states "[self-defense] is not available to a person who is attempting to commit, committing or escaping from the commission of a forcible felony." The State claimed Keys was not entitled to a self-defense instruction because he was charged with the forcible felony of aggravated robbery and had admitted he was committing a drug felony when he shot King. Defense counsel countered Keys had a right to argue he was defending himself when he shot King because he thought King was coming at him. The prosecutor said that if defense counsel made this argument, he would respond by informing the jury that self-defense was not a legal defense in this case. The district court agreed the parties could present this argument to the jury but declined to issue a self-defense instruction.

During closing argument, defense counsel argued Keys shot King because King lunged at him, noting Dr. Glenn's testimony suggesting King was shot at close range. In rebuttal, the prosecutor noted the jury had not been instructed on self-defense, so it would be unable to find Keys not guilty on that basis.

To determine whether a self-defense instruction was legally appropriate, we look to the applicable law on self-defense. As we clarified in *State v. Milo*, 315 Kan. ___, Syl. ¶ 1, ___ P.3d ___ (2022), a self-defense instruction is never legally appropriate for a felony-murder charge. But a self-defense instruction may be appropriate to negate criminal liability for an underlying inherently dangerous felony.

For self-defense to apply, the felony at issue must contain "an element of force, inherently necessary to the commission of the underlying crime." *Milo*, 315 Kan. at ___,

slip op. at 12. A person's use of force against another is justified "when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force." K.S.A. 2020 Supp. 21-5222(a).

Self-defense is an affirmative defense the accused may use to justify actions that otherwise would constitute the charged crime. *State v. Haygood*, 308 Kan. 1387, 1406, 430 P.3d 11 (2018). "A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies." K.S.A. 2020 Supp. 21-5108(c).

Keys makes several arguments to support his claim that a self-defense instruction was legally appropriate here. He alleges drug crimes are not forcible felonies and the term forcible felony is ambiguous and unconstitutionally vague as applied in this case. But Keys' arguments necessarily fail based on our rationale in *Milo*, 315 Kan. at ___, slip op. at 11-13:

> "We have allowed (or at least considered) self-defense instructions in certain felony murder cases when such an instruction was clearly not legally appropriate. This misstep arose out of a misplaced focus on whether the underlying inherently dangerous felony constituted a 'forcible felony.' This often occurred in 'drug deal gone bad' cases. See, e.g., *State v. Jacques*, 270 Kan. 173, 180-81, 14 P.3d 409 (2000) (cocaine possession was a forcible felony when the defendant stabbed the victim after being attacked, noting the 'aura of violence surrounding the possession of illegal drugs'); *State v. Ackward*, 281 Kan. 2, 24-26, 128 P.3d 382 (2006) (deeming possession of marijuana with intent to sell a forcible felony when two of the four people involved with a drug transaction were armed, and stating that '[t]he possession of or desire to possess illegal drugs often brews an atmosphere of violence with participants being susceptible to robbery and physical harm by others wanting their drugs or money').

30

"These decisions were analytically flawed, however, because they skipped a necessary step along the analytical path. We have clarified that self-defense in a felony murder case can *only* negate criminal liability for the underlying inherently dangerous felony as an *element* of felony murder (self-defense can never be a legal justification for the killing itself). Given this, a court presented with a self-defense claim in the context of felony murder must first examine the elements of the underlying inherently dangerous felony alleged by the state to determine whether any of those elements can be negated by a claim of self-defense. If the answer is no, then the self-defense instruction will not be legally appropriate.

"The key question to ask is whether there is an element of force, inherently necessary to the commission of the underlying crime, which could be justified by the defense of oneself or another. Stated another way, some crimes contain an element—the use of force—which may be negated by a proper claim of self-defense. One example is the inherently dangerous felony of criminal discharge of a firearm. K.S.A. 2020 Supp. 21-5402(c)(1)(O); K.S.A. 2020 Supp. 21-6308(a). The elements of that crime include that the defendant discharged a firearm, and that it was directed either at a dwelling or a vehicle in which there was a human being present. K.S.A. 2020 Supp. 21-6308(a). If the act of shooting that constitutes the criminal discharge was done in an act of self-defense, then self-defense should be available to the defendant. See *State v. Alderson*, 260 Kan. 445, 922 P.2d 435 (1996) (defendant charged with felony murder based on the underlying felony of criminal discharge of a firearm at an occupied vehicle, but self-defense instruction given because defendant argued he fired in self-defense).

"On the other hand, many crimes do not require the use of force at all to satisfy all elements. With regard to these crimes, self-defense is legally inappropriate. When there is no use of force to be legally justified, self-defense is simply a non sequitur. Other crimes do have an element of force, but that use of force cannot legally be justified as a defense of oneself or another."

31

Applying the analytical framework in *Milo*, we must determine whether any element of distribution or possession of a controlled substance with intent to distribute—K.S.A. 2020 Supp. 21-5705—can be negated by claiming self-defense. In *Milo*, 315 Kan. at ___, slip op. at 14, we explained the "distribution of marijuana, while statutorily categorized as inherently dangerous, does not include any element requiring the use of force." Because no statutory element of marijuana distribution or possession with intent to distribute requires the use of force, a self-defense instruction for felony distribution or possession of marijuana with intent to distribute is not legally appropriate.

We apply a related analysis to Keys' alternative underlying aggravated robbery conviction. K.S.A. 2020 Supp. 21-5420 provides: "Robbery is knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person. [] Aggravated robbery is robbery, as defined in subsection (a), when committed by a person who[] [i]s armed with a dangerous weapon." Aggravated robbery includes an element of force, but that force cannot be justified by self-defense. *State v. Holley*, 315 Kan. ___, Syl. ¶ 3, ___ P.3d ___ (2022). Because the force element involved in aggravated robbery cannot be justified based on the defense of oneself or another, a self-defense instruction was not appropriate for the underlying aggravated robbery charge against Keys in this case.

Based on the analysis above, no legal self-defense justification exists for the crimes of distributing a controlled substance or aggravated robbery. Thus, Keys is not entitled to a self-defense instruction or to self-defense immunity. Because a self-defense instruction would not have been legally appropriate, we need not address factual appropriateness or reversibility. *Roberts*, 314 Kan. at 849. Keys' remaining arguments regarding imperfect self-defense voluntary manslaughter and imperfect self-defense involuntary manslaughter jury instructions presume a self-defense instruction was appropriate. Given our conclusion to the contrary, we need not address these arguments.

32

5. *Cumulative error*

Finally, Keys argues the cumulative effect of the alleged errors deprived him of his constitutional right to a fair trial. But our analysis reflects there was no error, so the cumulative error doctrine does not apply. See *State v. Blansett*, 309 Kan. 401, 402, 435 P.3d 1136 (2019) (under cumulative error doctrine, court must identify "multiple errors to accumulate").

Affirmed.

WILSON, J., not participating.
STEVEN E. JOHNSON, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  District Judge Johnson was appointed to hear case No. 121,866 vice Justice Wilson under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.