NOT DESIGNATED FOR PUBLICATION

No. 126,181

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALLAN RENDALE TURNER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MABAN WRIGHT, judge. Oral argument held September 17, 2024. Opinion filed December 27, 2024. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, P.J., HILL and COBLE, JJ.

PER CURIAM: Allan Rendale Turner appeals his conviction by a jury of one count of attempted aggravated kidnapping and one count of aggravated battery. He challenges his conviction on multiple bases, as to sufficiency of the evidence at trial, various jury instruction issues, and issues of prosecutorial error. For the reasons to be discussed below, we largely find Turner's arguments unconvincing and affirm his conviction.

1

FACTUAL AND PROCEDURAL BACKGROUND

*An evening at the Plaza West Healthcare & Rehab Center*

The events leading to Turner's arrest occurred at the Plaza West Healthcare & Rehab Center (Center) and were established through considerable testimony at jury trial. Much of the narrative came from the victim, Jane. (All Center employees will be referenced here by use of pseudonyms.)

On the night of July 27, 2020, Jane was working as a licensed practical nurse at the Center in southwest Topeka. The Center was then on lockdown due to the COVID-19 pandemic, so it was closed to the public. It was partially surrounded by a fence that had two gates and its own set of alarms.

Around 9:30 p.m., Jane was on a telephone call when she and three other nurses working around the nurse's station heard the conference room alarm sound. Jane noticed the alarm panel lit up at the nurse's station and the tone of the alarm was indicating the conference room door was open. She heard no exterior gate alarm. The protocol for when an alarm sounded was to check that all the residents were accounted for to ensure no one left the facility. The charge nurse and staff would conduct a head count and check on the alarmed door before silencing it.

Jane went to check on the alarm in the conference room. She did not recall anyone following her, but Mary, another nurse working that night, trailed behind her. Only half of the lights in the hallway were illuminated because the lights were dimmed at night for the residents' comfort. When Jane reached the conference room, she found the interior door closed and could tell the conference room lights were off through the glass panel on the side of the door. The conference door was unlocked, and Jane opened the door.

2

The first thing Jane saw as she opened the door was a man standing in the room near the conference table. She described him as a Black male, approximately 6 feet tall, wearing a blue surgical mask and no shirt; she did not recall if he had any tattoos. Jane said she did not recognize the man and was confident that he was not a resident or an employee. She saw that the exterior backdoor behind the man was closed. At this point, Jane had stepped only a couple of feet inside the room.

Initially, Jane did not feel a reason to flee and tried to maintain control. She told the man that he was "not supposed to be in here" and asked him to leave through the door he came in. She assumed the man came in through the conference room's exterior backdoor because the alarm for that door was sounding and it was the only way into the conference room other than the interior door she opened. Jane did not turn on the lights when she entered the conference room but was still able to see the man looking at her because there were lights coming in from the hallway and the windows adjacent to the backdoor.

The man responded, "'No, I need you to suck my dick, bitch,'" and, facing her, he grabbed Jane's shoulders with both of his hands. She tried to push him away but was unable to. In her later trial testimony, she described their struggle, saying although they began facing one another, she was later flipped around so the man was behind her, with one of his arms wrapped around her while he punched and pushed her with his other arm. The man continued punching Jane in her face, side, and legs as he tried to push her into a closet inside the conference room, near the interior door. Jane started screaming for help and telling someone to call 911. The man told her to "'Shut up'" repeatedly. The man also told her, "'This won't take long,'" and "'Quit screaming, quit yelling,'" as she continued to shout for help.

During their struggle, Jane and the man fell to the ground. Jane was on the ground as the man was on top of her and behind her, trying to push her into the closet. Jane tried

3

to fight back by pushing, pinching, and biting him, but she could not take control. He pushed her halfway into the conference room closet when he suddenly stopped. The man inexplicably stood up and ran out of the interior door Jane had arrived through. Jane tried to lock the door so she could call 911, but she was not fast enough, as the man quickly returned through the same door.

The man then grabbed and pushed Jane against the wall, placing her in a chokehold using his bicep and forearm. Jane could not breathe and thought she would die when again, the man suddenly stopped and left through the exterior backdoor of the conference room. Jane left through the interior door into the hallway toward the nurse's station, and recalled someone was already on the phone with 911. She suffered several physical injuries, including rug burns on her knees and elbow, bruising on her face, and she was mentally traumatized.

Jane recounted her descriptions of the attack and the man who attacked her to the 911 operator, including that he was a thin African American male wearing blue jeans with trimmed short-shaved hair. While she was in the nurse's station area, law enforcement officers arrived on scene. Jane did not speak to the officers immediately because they were looking for the unknown assailant, but she then heard a coworker yell, "He's back." She then heard people saying, "They got him," and as the commotion died down, she went back to the conference room to confirm that law enforcement arrested her assailant. Jane saw a man sitting on the floor with his back against the wall of the conference room. This was the first time Jane saw the man in a fully lit room, and the man in custody was not wearing blue jeans but was in shorts when Jane saw him again sitting in the conference room. Even so, at trial, she testified this identification took place just minutes after her attack, and she was "100 percent sure that it was" the man who attacked her.

*Other witness testimony corroborates Jane's account.*

Other Center employees and law enforcement accounts at trial corroborated Jane's testimony. When Jane walked to the conference room to check the exterior door, her coworker, Mary, followed her. Mary saw Jane stop and look into the conference room, then saw an African American man who was inside the conference room grab Jane. As the man and Jane struggled, and the man tried to drag Jane into the room, Mary called 911. When Jane finally exited the conference room, Mary at some point gave Jane her phone to talk to emergency operators. Mary did not see the face of the attacker. She only remembered that he was a tall, skinny, African American male, but only saw him from the side.

Detective Scott Sinsel, then an officer with the Topeka Police Department, was the first officer to arrive at the Center. A staff member guided him to the dark, closed conference room. With his flashlight, he could see an article of clothing on the ground in front of the entrance to the conference room. As he entered the room, he turned on the lights and checked the exterior door for damage. The officer saw nothing on the conference room table aside from some plastic cutlery. Finding no damage and no one in the room, he left it to let another officer inside the main Center entrance.

At this time, Mary and another employee, Rick, were talking near the conference room and Rick noticed on the floor of the conference room what he believed to be Jane's cloth mask. As he retrieved it, Rick heard the exterior conference room door opening and saw a black hand coming through the door, holding an orange-colored paring knife. Mary was standing at the threshold of the interior conference room door, and both she and Rick ran to where Officer Sinsel was and yelled that the man was back.

Once Officer Sinsel reached the conference room, he saw a black male standing on the opposite side of the room, in front of the exterior door. Officer Sinsel saw the man

5

was not wearing a shirt and was wearing gray or bluish shorts. A large suitcase and what appeared to be a red sheathed knife were on the table. Officer Sinsel yelled, "Topeka" and the man put his hands in the air. Officer Sinsel then directed him to get on the ground, cross his feet, and not move, and the man complied.

As other officers arrived, they placed the man in handcuffs. An officer found a wallet in the blue jeans outside the suitcase that contained photo identification identifying the man as Turner. Officers checked the exterior conference room door and discovered that it did not lock. Testifying law enforcement was unaware of anyone taking DNA or other physical evidence from Jane or fingerprints from the gates, exterior door, interior door, or the closet door.

That night, Turner was arrested and charged with multiple felonies, including aggravated kidnapping, aggravated burglary of a nondwelling, and aggravated battery. Later his charges were amended to include attempted aggravated criminal sodomy.

*Turner tells a different story.*

During trial, Turner testified on his own behalf and provided a different version of what happened. Turner said that on that night, he was unhoused and unemployed. On the evening of his arrest, he had been at the bus station most of the day trying to make some money to get high. Turner met a man called "Deuce" there, and Deuce told him that he could get some "stuff," which Turner explained was methamphetamine. Turner had never met Deuce before and neither man shared their real names with the other. The two boarded a free bus and exited by 21st and Fairlawn, next to a Kwik Shop. Turner said Deuce met up with some people there and obtained methamphetamine, which they decided to smoke.

After smoking, Turner wanted to get higher, so they left the area and started walking. Turner was unfamiliar with the area, so he followed Deuce over a bridge, down a hill, and through a gate into the back area of the Center. Once they were there, Deuce gave Turner a "big shot" of methamphetamine and Turner went into a stupor or briefly passed out. Turner testified that was the last time he saw Deuce. When he looked up, no one was around, but he saw a light on inside so he tried to go inside thinking Deuce may be inside the building. He took his stuff, his suitcase and bag, with him inside. He put his stuff on the table, took off his pants, shirt, and shoes—because he was hot from being high—before he was confronted by a police officer just a minute or two later and arrested.

Turner denied having any interaction with Jane that night. Turner admitted the red or orange knife found on the table was his but denied wielding the knife in his hand and testified that it was in his pockets. He said the knife was placed on the table when he emptied his pockets. Turner said he believed he was getting into trouble for being in the building but was unaware what had happened when the police arrested him. At trial, he opened his shirt to show the jury the tattoos that cover his chest and stomach.

*The jury finds Turner guilty.*

At the conclusion of the trial, the jury acquitted Turner on the charges of aggravated burglary and attempted aggravated criminal sodomy, but found him guilty of attempted aggravated kidnapping, the lesser included offense of the charged aggravated kidnapping, and aggravated battery. The district court sentenced Turner to a controlling 233 months in prison.

Turner timely appeals his convictions.

THE STATE PRESENTED SUFFICIENT EVIDENCE OF ATTEMPTED AGGRAVATED
KIDNAPPING AND THE JURY INSTRUCTION WAS FACTUALLY APPROPRIATE

To introduce Turner's first argument, we recite the relevant portion of the jury instruction for attempted aggravated kidnapping, which closely follows the aggravated kidnapping statute, K.S.A. 21-5408, and the relevant portion of the attempt statute, K.S.A. 21-5301(a).

"1.    The defendant performed an overt act toward the commission of aggravated kidnapping.

. . . .

"The elements of the completed crime of aggravated kidnapping are as follows:

"1.    The defendant confined [Jane] by force and/or threat.

"2.    The defendant did so with the intent to hold [Jane] to facilitate the commission of any crime *or* to inflict bodily injury on or to terrorize [Jane].

"3.    Bodily harm was inflicted upon [Jane]." (Emphasis added.)

Turner's initial argument was that because the crime of aggravated kidnapping includes alternative means of committing the crime—that is, (1) to facilitate flight or the commission of another crime, or (2) to inflict bodily injury or terrorize the victim—the State was required to prove both means of committing the crime. In other words, the State was required to satisfy a "super-sufficiency" test. See *State v. Wright*, 290 Kan. 194, 201, 224 P.3d 1159 (2010) (requiring substantial evidence supporting each means of criminal element included in instruction).

But this super-sufficiency test was overruled by our Supreme Court while this case was pending. See *State v. Reynolds*, 319 Kan. 1, 2, 552 P.3d 11 (2024) (rejecting *Wright*'s "inflexible rule" that requires sufficient evidence of each means of a criminal element included in an instruction). We asked the parties to provide supplemental briefs on *Reynolds*' impact on this case, and they did.

8

Turner now argues the evidence was insufficient to support his conviction for attempted aggravated kidnapping based on confinement that was incidental to another crime. So, the related jury instruction permitting the jury to convict him based on confinement with the intent to facilitate any crime was factually inappropriate.

1. *Legal Standards Applicable to Alternative Means Challenges*

Under the new framework provided by *Reynolds*, appellate courts review alternative means challenges just as we do other instructional challenges. This means that "[i]f a defendant claims a jury instruction contained an alternative means error, the reviewing court must consider whether the instruction was both legally and factually appropriate." 319 Kan. 1, Syl. ¶ 4. We then apply "unlimited review to determine whether the instruction was legally appropriate and will view the evidence in the light most favorable to the requesting party when deciding whether the instruction was factually appropriate." 319 Kan. at 17.

If an instructional error occurred but the defendant did not challenge this error before the district court, the defendant is entitled to a new trial only if he shows that the instruction was clearly erroneous. 319 Kan. at 18-19; see K.S.A. 22-3414(3). Turner did not object to this instruction at trial, so we apply this clear error standard. Under this standard, an error is clear when the court is firmly convinced that the jury would have reached a different verdict if the instructional error had not occurred. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

2. *Application of the* Reynolds *framework*

Applying this standard, we first note Turner does not contest that the instruction was legally sound, so any argument to the contrary is waived. *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021). And the instruction given to the jury accurately reflected

9

both K.S.A. 21-5408, the aggravated kidnapping statute, and the corresponding pattern instruction. See PIK Crim. 4th 54.220 (2019 Supp.); see also *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022) (Our Supreme Court "'strongly recommend[s] the use of PIK instructions.'").

Our analysis then focuses on the factual appropriateness of the instruction. Again, under this prong we must view the evidence in the light most favorable to the requesting party—here, the State. *Reynolds*, 319 Kan. at 17. Turner does not challenge the "to inflict bodily injury on or to terrorize" portion of the instruction, so we may presume this segment of the instruction—one alternative means—is factually sound. We then concentrate, as do the parties, on the other alternative means portion of the instruction which reads: "The defendant [confined Jane] with the intent to hold [Jane] to *facilitate the commission of any crime* . . . ." (Emphasis added.)

2.a. *The* Buggs *test applies to the facilitation analysis.*

To analyze the facilitation issue, Turner relies on our Supreme Court's decision in *State v. Buggs*, 219 Kan. 203, 547 P.3d 720 (1976). In *Buggs*, the court held the "kidnapping statute is not reasonably intended to cover movements and confinements which are slight and 'merely incidental' to the commission of an underlying lesser crime." 219 Kan. at 215. For a taking or confining to constitute facilitating a crime, it "must have some significant bearing on making the commission of the crime 'easier' as, for example, by lessening the risk of detection." 219 Kan. at 215. The court devised a three-part test to determine whether the taking or confining was distinct from the underlying crime. 219 Kan. at 216. To be distinct enough to support a conviction of kidnapping under K.S.A. 21-5408(a)(2), the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;
"(b) Must not be of the kind inherent in the nature of the other crime; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

Our Supreme Court more recently applied the *Buggs* test in *State v. Couch*, 317 Kan. 566, 533 P.3d 630 (2023). In *Couch*, the defendant grabbed the victim and moved her through a home to the bedroom, hallway, and the bathroom while committing multiple criminal sex acts. Applying the *Buggs* test, the court found the evidence failed to establish that the taking or confining of the victim was done to facilitate the commission of any separate crime. *Couch*, 317 Kan. at 588-89.

Turner argues the facts of his case are like those in *Couch*. The State, on the contrary, challenges the *Buggs* decision and asks this court to abandon the three-part test in whole.

But as the State acknowledges, the Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication the court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). True, our Supreme Court has recently shown some indication of reconsidering the *Buggs* decision, with four-to-three majorities in both *State v. Butler*, 317 Kan. 605, 533 P.3d 1022 (2023), and *Couch*. See *Butler*, 317 Kan. at 612 (Stegall, J., concurring) (concurring in the judgment and citing *Couch*); *Couch*, 317 Kan. at 599-604 (Stegall, J., dissenting) (promoting abandoning *Buggs* because it is "untenable as a species of our multiplicity doctrine" and "it fails as a matter of ordinary statutory interpretation"). But the decision to overrule half-century-old precedent is left to our Supreme Court; it is not for us to decide. We are left to apply the existing test—that is, the *Buggs* test.

2.b. *Applying* Buggs*, there was sufficient evidence to support facilitation, so the instruction was factually appropriate.*

Because the jury acquitted Turner of the aggravated burglary and attempted aggravated criminal sodomy charges, he argues the only separate crime that could support his attempted aggravated kidnapping conviction was the aggravated battery charge. Turner claims the attempted confinement of Jane was incidental to the aggravated battery and could not sustain a separate charge of kidnapping.

Yet, as the State argues, under K.S.A. 21-5408(a)(2), a defendant need not be convicted of another crime to be charged with kidnapping for the purpose of facilitating the commission of that crime. Under the plain reading of the statute, the focus is on the defendant's intent of "*commission* of *any* crime," rather than on the successful completion or conviction of the facilitated crime. (Emphasis added.) K.S.A. 21-5408(a)(2). As directed in *Buggs* and since in many other cases, including *Butler* and *Couch*, the confinement or taking must simply make the commission of another crime easier or considerably lessen the risk of detection. *Butler*, 317 Kan. at 608. Accordingly, the crucial element is the actual aid in commission of the crime, not the ultimate outcome of the crime intended to be facilitated.

We must also remember the lens through which we are required to view the evidence. Because we examine whether the evidence was factually sufficient to support the instruction, we view the evidence in the light most favorable to the State. *Reynolds*, 319 Kan. at 17.

Here, Turner was very intentionally attempting to force Jane into the closet inside the conference room. This action was not part or parcel of any of the other charged crimes. Turner could have committed any of the other charged crimes at the moment he encountered Jane in the conference room, but viewing the evidence in the light most

12

favorable to the State, there is little doubt he wanted her to be inside the closet. Forcing Jane into the closet inside the conference room would have made the commission of the other person crimes—whether sodomy or battery—substantially easier by ensuring Jane was confined and controlled and would have substantially lessened the crimes' detection. The closet was a smaller, enclosed area, presumably without the window through which a passerby could see inside like the one along the conference room door. Again, moving Jane to the closet would both conceal any crime against her and make it more difficult for her to escape Turner's grasp.

For these reasons, a reasonable fact-finder could have found that Turner tried to confine Jane to facilitate other crimes, such as aggravated criminal sodomy or aggravated battery. Because the evidence was sufficient under *Buggs* to support facilitation, the jury instruction was factually appropriate. Finding the instruction both legally and factually appropriate, we find no clear error.

EVEN IF THE DISTRICT COURT ERRED BY NOT GIVING AN EYEWITNESS IDENTIFICATION JURY INSTRUCTION, IT WAS NOT REVERSIBLE CLEAR ERROR

Turner next argues the district court erred by failing to provide the jury a cautionary instruction on eyewitness identification. PIK Crim. 4th 51.110 (2022 Supp.), "Eyewitness Identification," outlines several factors for the jury's consideration:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

13

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

The instruction's Notes on Use clearly state the "instruction should be given whenever the trial judge believes there is any serious question about the reliability of eyewitness identification testimony." PIK Crim. 4th 51.110, Notes on Use.

Turner argues that because the case against him was built entirely on Jane's identification of him as her attacker, the district court should have instructed the jury on the factors to be used when determining whether the State proved identification beyond a reasonable doubt.

1. *Legal Standards Applicable to Review of Jury Instructions*

As stated briefly in the previous section, when analyzing jury instruction issues, an appellate court examines the legal and factual appropriateness of the instruction, using an unlimited standard of review of the entire record. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. 313 Kan. at 255.

If a party asserts an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. K.S.A. 22-3414(3); see *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018). For a jury instruction to be clearly erroneous, the court must be firmly convinced that the jury would have reached a different verdict if the erroneous instruction had not been given. *State v. Shields*, 315 Kan. 814, 823-24, 511 P.3d 931 (2022). The party

14

claiming error has the burden to show clear error. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

Turner concedes the jury instruction he now seeks was not requested at trial. So, if we were to find that an eyewitness instruction would have been legally and factually appropriate—and so was excluded in error—then we must determine whether the failure amounted to clear error. *Crosby*, 312 Kan. at 639.

2. *The eyewitness instruction was likely factually and legally appropriate, so the failure to give the instruction was erroneous.*

We first briefly examine whether the instruction would have been factually and legally appropriate. Typically, this would be a more significant focus of our analysis. Here, though, because we next find any error does not amount to reversible error, we need not delve too far into the weeds. Turner claims this instruction should have been provided because the eyewitness identification was critical to the State's case. No physical evidence, including DNA or other forensic identification, was collected by the law enforcement officers on scene and Turner did not admit he was in the conference room during the attack. And the State concedes eyewitness identification was a critical part of its case, but contends there was no serious question regarding the reliability of the identification.

Both parties are correct to emphasize that the district court must provide a cautionary instruction regarding eyewitness identification when such identification is critical to the prosecution's case and whenever any serious question regarding the reliability of eyewitness identification testimony is present. *Shields*, 315 Kan. at 821. In other words, the trial court need not give this instruction unless there is evidence causing the trial court to question the reliability of the eyewitness identification. See *State v. Harris*, 266 Kan. 270, 278, 970 P.2d 519 (1998). To determine whether such a serious

15

question was raised, we consider the factors set out in *State v. Duong*, 292 Kan. 824, 836, 257 P.3d 309 (2011), including the opportunity the witness had to view the defendant, the degree of attention the witness had, the accuracy of the description, the witness' level of certainty, and the length of time between the crime and the witness' confrontation.

"Such a cautionary instruction is often prudent because although 'juries usually attach great weight to eyewitness identification' those in the legal profession know 'that such identification is often unreliable.'" *Shields*, 315 Kan. at 819 (quoting *State v. Hunt*, 275 Kan. 811, 818, 69 P.3d 571 [2003]). Kansas caselaw generally "recognizes that eyewitness identifications can be unreliable and result in wrongful convictions, causing some of the most tragic miscarriages of justice." *State v. Mitchell*, 294 Kan. 469, 474, 275 P.3d 905 (2012).

And here, many of the factors found in the cautionary eyewitness identification instruction were present in the circumstances at trial. Lighting in the room, although ambient, was poor. Jane had never seen the man before. Though she was initially calm, the man threatened her, which caused understandable heightened emotion in the witness. For these reasons, we cannot say with certainty that the instruction would have been factually or legally inappropriate. Even so, we do not find the failure to provide it amounts to reversible error.

3. *The error is not reversible.*

For the district court's failure to give this instruction to be reversible error, we must be firmly convinced that the jury would have reached a different verdict if the instruction had not been given. *Shields*, 315 Kan. at 823-24. We are not so convinced.

At trial, Turner's defense counsel questioned Jane about the reliability of her eyewitness identification. During cross-examination, defense counsel challenged her

16

physical description of her attacker. His counsel also emphasized that the first time Jane saw her attacker in a lighted room was when she returned to the conference room after the attack and after Turner was already in police custody. During closing arguments, his counsel also highlighted the differences between the description of the attacker Jane provided during the 911 call and Turner's appearance.

Even so, we have no serious doubt regarding the reliability of Jane's eyewitness identification in light of all the information presented at trial. Jane had sufficient opportunity to view her assailant even before the attack began, and her degree of attention during the encounter was not challenged by Turner. Jane testified that despite the lack of lighting in the conference room, there was enough ambient light coming from the outside and hallway for her to identify the man's primary characteristics (African American, 6 feet tall, shirtless, wearing a surgical mask over his face) and know he was not a resident or employee of the Center. Before the attack, Jane was nervous but composed enough that when she first saw the man in the conference room, she tried to maintain control and speak with the man calmly. She was also face-to-face with her attacker when he charged her and grabbed her by her shoulders.

Jane's description of the attacker also reasonably matched Turner's description. Although Jane did not recall his tattoos, that omitted detail could be reasonably explained by the dim light during the encounter. And, even if Turner was not wearing jeans when he was arrested as Jane had described earlier, that alleged inconsistency is easily explained by the gap of time between him leaving the room and encountering the police when he reentered the same room. Jeans with Turner's own identification inside the pocket were found on the conference table inside the room, and he testified to removing them inside the conference room.

Finally, Jane returned of her own volition—not as the result of a police request— to identify her attacker once Turner was arrested. It was not, as Turner alleged, a police-

induced one-person "show up." And she testified that, at the time she saw Turner in the fully lit conference room, she was 100 percent certain that he was the attacker. This identification by Jane happened within minutes of the attack, so the length of time between the crime and the confrontation was minimal.

When considering Jane's testimony as a whole, there were no serious questions raised regarding the reliability of her eyewitness identification, and thus we are not convinced the jury would have reached a different verdict had the cautionary instruction been given. While best practices suggest that any time an eyewitness identification is critical to the State's case, such as here, the cautionary instruction be given—the evidence here saves the State's case.

In addition to the evidence presented, the cautionary instruction is not the only procedural safeguard against unreliable eyewitness identification used in this trial. Others included Turner's "'Sixth Amendment right to confront the eyewitness,'" and his right to his own counsel "'who [could] expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments.'" *State v. Marshall,* 294 Kan. 850, 869, 281 P.3d 1112 (2012) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 245-46, 132 S. Ct. 716, 181 L. Ed. 2d 694 [2012]). As explained above, each of these important safeguards were part of this trial.

Because the reliability of Jane's eyewitness identification was fully explored during trial, both through evidence presented and other procedural safeguards, the failure to provide the cautionary instruction did not reach the level of reversible, clear error.

In Turner's next claim on appeal, he focuses on the district court's admission of testimony by Officer Alex Kuebler. Officer Kuebler responded to the Center after the emergency call on the night of the incident and testified about how he remained outside the Center for a few minutes before going inside the building. The prosecutor's questioning focused on whether Officer Kuebler saw anyone suspicious outside the building or heard any radio reports from other officers who may have seen anyone suspicious. Turner argues the district court erred when it admitted into evidence Officer Kuebler's testimony reciting what the officer heard over the police radio regarding any suspicious individuals on the Center property.

At trial, defense counsel contemporaneously objected to Officer Kuebler's testimony to what he heard over the police radio. On review of the record, counsel's timely and specific objection properly preserved the issue for our review. See K.S.A. 60-404; *State v. Brown*, 316 Kan. 154, 161, 513 P.3d 1207 (2022).

1. *Legal Standards Applicable to Admission of Evidence*

"The admission of evidence involves several legal considerations:  determining relevance; identifying and applying legal principles including rules of evidence; and weighing prejudice against probative value. [Citation omitted.]" *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). Appellate courts apply different standards of review depending on the consideration at issue.

Whether a particular legal principle or statutory rule governs the admission of specific evidence is a question of law subject to de novo review. See *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018). But appellate courts typically review a trial court's determination that hearsay is admissible under a statutory exception for an abuse

19

of discretion. *State v. Jones*, 306 Kan. 948, 957, 398 P.3d 856 (2017). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022).

Under K.S.A. 2023 Supp. 60-460, hearsay is defined as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." Hearsay statements must be excluded unless the statement qualifies under a statutory exception prescribed under K.S.A. 60-460, but out-of-court statements that are not offered to prove the truth of the matter asserted are not hearsay. *State v. Sinnard*, 318 Kan. 261, 287, 543 P.3d 525 (2024). "The theory behind the rule excluding hearsay evidence is that the credibility of the declarant is the basis for the reliability of the statement, and the declarant must therefore be available for cross-examination." *State v. Seacat*, 303 Kan. 622, 635, 366 P.3d 208 (2016).

2. *The admission of Officer Kuebler's testimony was inadmissible hearsay.*

At the heart of Turner's challenge is this exchange between the prosecutor and Kuebler:

"[PROSECUTOR]: Did you hear any radio traffic from other officers who were in the vicinity of anyone that was on the property that was suspicious?
"[DEFENSE COUNSEL]: Objection, calls for speculation—calls for hearsay.
"[PROSECUTOR]: No, I'm asking—well, I'm asking him if he heard any radio traffic about anyone being located outside of the property that was suspicious.
"[DEFENSE COUNSEL]: That would be hearsay unless he could establish the declarant.

20

"[PROSECUTOR]:  I believe that would be imputed knowledge between the officers.

"THE [JUDGE]:  I agree. The objection is overruled."

Turner argues the exception raised by the prosecutor—the collective knowledge doctrine—was incorrect and the testimony should not have been admitted. He claims the exception cited by the prosecutor only applies in the context of the Fourth Amendment to the United States Constitution and should not have been accepted by the district court. Turner asserts the testimony from Officer Kuebler was conveying an unspecified declarant's out-of-court statement, which was used to attack Turner's testimony that he was not Jane's assailant and instead another man, Deuce, was with him on the premises.

The State concedes that the collective knowledge doctrine, or imputed knowledge among law enforcement officers, exists in the realm of the Fourth Amendment and not in the context of hearsay. See *State v. Miller*, 49 Kan. App. 2d 491, 497, 308 P.3d 24 (2013) (holding, in the Fourth Amendment search and seizure context, the collective knowledge doctrine allows a police officer to "stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of the facts that would provide the necessary level of suspicion to permit the given action").

Given the State's concession, and after our review, we must agree. The collective knowledge doctrine does not apply here, and Officer Kuebler's testimony does not qualify under any of the hearsay exceptions established under K.S.A. 60-460. So, the district court erred by admitting the hearsay testimony into evidence over Turner's objection at trial. But this does not conclude our analysis.

21

3. *The hearsay error was harmless.*

Having found error in the erroneous admission of evidence, we must next consider whether the error was harmless under K.S.A. 60-261. *State v. Lowery*, 308 Kan. 1183, 1235-36, 427 P.3d 865 (2018). Under this test, the party benefitting from the error—here, the State—has the burden to show there is no reasonable probability that the error affected the outcome of the trial considering the entire record. *State v. Gaona*, 293 Kan. 930, 940, 270 P.3d 1165 (2012); see also K.S.A. 2023 Supp. 60-261 (erroneous admission of evidence is harmless unless it affects the defendant's substantial rights).

Turner argues the State cannot meet its burden. Although he did not dispute being in the Center that night, he denied being the person who attacked Jane. Because identity was the crux of his defense, Turner claims the State's use of Officer Kuebler's hearsay statement rebutted this defense. Because there was no forensic evidence supporting the eyewitness identification, Turner believes the State's hearsay statement could have affected at least one juror and thus the outcome of the verdict.

But the State claims any error was harmless because other evidence aside from the challenged hearsay statement established that no other suspicious people were seen on the property. Officer Kuebler's Axon body camera video was admitted as evidence during trial and shown to the jury. In the video, Officer Kuebler was shown at an entrance trying to get in and then running around the Center to another entrance. No one else was shown in the area Officer Kuebler was running through. Additionally, another officer's body camera video was also admitted into evidence. That video showed Officer Hans Lewin driving around the building trying to find a way in after being unable to get in through one of the entrances. At one point, Officer Lewin parked his patrol vehicle and walked around a fence on the side of the building, but he was again unable to get in. No other person was shown in Officer Lewin's body camera footage.

22

Even though the statement by Officer Kuebler was hearsay, the State was still able to accomplish the intended effect of the inadmissible statement through use of other evidence. While Turner testified that he was with another individual, Deuce, at the facility that night, the strength of his testimony was offset by the testimony of the officers and their body camera videos, which tended to reflect that no other suspicious person was located outside of the facility. It was up to the jury, then, to weigh the veracity of the evidence presented.

The State met its burden to show there is no reasonable probability that the error could affect the outcome of the trial in light of the entire record. See *Gaona*, 293 Kan. at 940. The erroneous admission of the hearsay evidence by the district court was harmless.

THE DISTRICT COURT DID NOT ERR BY NOT PROVIDING A LIMITING INSTRUCTION

In his fourth argument on appeal, Turner claims the district court erred by failing to provide a limiting instruction regarding his illegal drug use on the night of his arrest.

1. *Legal Standards Applicable to Limiting Instructions*

Our Supreme Court has explained that the "overarching purpose of the limiting instruction . . . is to '"eliminate the danger that [K.S.A. 60-455] evidence will be considered to prove the defendant's mere propensity to commit the charged crime."'" *State v. Breeden*, 297 Kan. 567, 582, 304 P.3d 660 (2013). A defendant can challenge the lack of a K.S.A. 60-455 limiting instruction as clearly erroneous even if the defendant did not object to the admission of the other crimes evidence at trial. 297 Kan. at 579-80. When a district court admits evidence under K.S.A. 60-455, the court is not required to issue a limiting instruction, but it does not unfairly bias the jury against the defendant if it gives one. See *State v. Dean*, 298 Kan. 1023, 1035, 324 P.3d 1023 (2014).

The same jury instruction standard of review discussed above applies. We first review whether the district court erred—that is, whether the instruction at issue was legally and factually appropriate. *Holley*, 313 Kan. at 253. Next, we assess whether any error requires reversal. 313 Kan. at 253. But since this jury instruction issue was raised for the first time on appeal, the district court's error is reversible only if the failure to provide the legally and factually appropriate instruction was clearly erroneous. *Butler*, 307 Kan. at 845. Again, for the error to reach the level of clear error requires us to be firmly convinced the jury would have reached a different verdict if the omitted instruction were given. 307 Kan. at 859. As the party claiming error, Turner bears the burden to show both error and prejudice. *Crosby*, 312 Kan. at 639.

2. *The limiting instruction was not legally or factually appropriate.*

During his trial testimony, Turner voluntarily admitted to using methamphetamine the night of the incident and mentioned he was high multiple times. But at the outset, we must point out that fatal to his argument is that his admission of illegal drug use did not qualify as a prior wrongdoing as described under K.S.A. 60-455. "K.S.A. 60-455 does not apply if the evidence relates to crimes or civil wrongs committed as a part of the events surrounding the crimes for which [the defendant] was on trial—that is, the res gestae of the crime." *State v. King*, 297 Kan. 955, 964, 305 P.3d 641 (2013). Turner's testimony was clear that his drug use was part of the events and actually part of his defense: that he was incapacitated and, as a result, outside the Center at the time Jane was being assaulted, while Deuce—the person who got the drugs for him—was the person who attacked her. So, K.S.A. 60-455 is entirely inapplicable to this evidence.

Even so, he argues a limiting instruction was still legally appropriate because his testimony should have been used for the sole purpose of showing that he was high during the incident as part of his defense theory that he was not the person who attacked Jane, and not to show bad character or as propensity evidence.

24

Turner relies on our Supreme Court's decision in *State v. Peppers*, 294 Kan. 377, 276 P.3d 148 (2012), for support. Yet *Peppers* is inapplicable to this situation. There, our Supreme Court was examining the probative value of gang affiliation evidence, then weighing that value against its potential for prejudice. The court found that "although a district court is not required to *sua sponte* give a limiting instruction on gang affiliation evidence," the "giving of a limiting instruction in the context of gang affiliation evidence is 'one of many factors,' not the sole factor, that a court ought to consider in determining prejudice." 294 Kan. at 391.

Turner claims our Supreme Court's praise for the district court's effort to contain undue prejudice supports his claim that the limiting instruction was legally appropriate in his situation. But his argument is conclusory and unpersuasive.

While it is true our Supreme Court applauded the district judge's issuance of a limiting instruction in *Peppers*, even when the situation did not necessarily require one, that does not create a legal foundation for a limiting instruction in this case. In *Peppers*, the admission of the gang affiliation evidence was hotly contested, and its admission was thoroughly litigated by the parties both through pretrial motions and during trial. Here, Turner admitted his drug use himself at trial over no objection. And, in *Peppers*, the limiting instruction was sought by the defendant at trial, but no such instruction was requested here. See 294 Kan. at 385.

Moreover, Turner argues the instruction was factually appropriate here simply because the district court admitted prejudicial evidence of prior drug use. Turner again solely relies on *Peppers* for support, although we find no support there, for the same reasons discussed above.

25

If the evidence does not fall under K.S.A. 60-455, which we have already determined, the limiting instruction is not legally appropriate and there is no error in failing to provide one. See *State v. Gonzalez*, 307 Kan. 575, 597, 412 P.3d 968 (2018).

Because the instruction was not legally appropriate, there can be no error, and we need not address the issue further.

THE DISTRICT COURT DID NOT ERR BY NOT PROVIDING A UNANIMITY INSTRUCTION

Next, Turner challenges the district court's failure to provide a unanimity instruction because he claims there were multiple acts that could have constituted the attempted aggravated kidnapping and the aggravated battery.

Turner argues the jury unanimity instruction was legally appropriate because the State alleged several acts and any one of those acts could result in Turner's conviction. He also claims the instruction was factually appropriate because the State alleged two separate encounters: the initial grabbing and hitting, and the choking that occurred after the attacker came back into the room. He reasons that any juror could have relied on any of these acts to convict Turner of attempted aggravated kidnapping or aggravated battery.

A defendant has a right to a unanimous jury verdict. *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014) (citing K.S.A. 22-3421; K.S.A. 22-3423[1][d]). When a defendant asserts a violation of this right, "[t]he threshold question is whether the jurors heard evidence of multiple acts, each of which could have supported conviction on each respective count. That is a question of law subject to unlimited review. [Citations omitted.]" *State v. Moyer*, 306 Kan. 342, 359, 410 P.3d 71 (2017); *Santos-Vega*, 299 Kan. at 18.

If the case does offer a multiple acts circumstance, we then move to examine whether an error occurred. "'"To avoid error, the State must have informed the jury which act to rely upon or the district court must have instructed the jury to agree on the specific act for each charge."'" *Moyer*, 306 Kan. at 359 (quoting *State v. Castleberry*, 301 Kan. 170, 185, 339 P.3d 795 [2014]). Then, the court must determine whether any error was reversible or harmless. *Moyer*, 306 Kan. at 359.

Our Supreme Court has identified factors to assist in deciding whether a case involves multiple acts or whether it was unitary conduct: "'(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." 306 Kan. at 360.

Turner argues the State, through Jane's testimony, provided multiple acts that the jury could have relied on to convict him of attempted aggravated kidnapping and aggravated battery. Specifically, he claims Jane testified to having two separate encounters with the man who attacked her: once when they first met in the conference room and ended up struggling on the floor, and again when the man left the room briefly and came back to choke her. Turner points out that in the State's closing argument, the prosecutor suggested either the struggle on the floor or the chokehold could have been the confinement that supported his conviction of attempted aggravated kidnapping.

The State, on the other hand, argues the four factors applied here weigh against multiple acts. For the first two factors, the State claims the acts occurred at the same time and in the same location. As for the third factor, the State asserts there was no evidence of any intervening event. Lastly, the State argues there was no fresh impulse that triggered another act. The State thus argues the evidence shows that Turner's acts constituted a single, unitary incident. The State also points to the transcript to note only

27

the act of choking Jane was elected by the State as the basis for the aggravated battery charge.

On review of the record and the applicable factors, we find Turner's case does not present a multiple acts scenario. Unlike in *King*, which Turner cites for support, the acts involved in the circumstances of Turner's conviction of attempted aggravated kidnapping and aggravated battery are not so separated. In *King*, although the incidents occurred in the same location, the defendant rammed his truck into his father's vehicles, left, and then returned 5 to 10 minutes later to again ram his father's vehicles. Our Supreme Court found there was an intervening event, and he had a fresh impulse to return and hit the vehicles again. 297 Kan. at 983. Also, because two vehicles were damaged and there were two incidents, the court found the jury would have been uncertain whether both vehicles were damaged in each incident or if separately. Thus, the court treated *King* as a multiple acts case. 297 Kan. at 984. But that is not the situation in which we find ourselves here.

Although Turner claims there were two separate incidents like in *King*, he fails to articulate what intervening event separated them. Although we do not know why there was a brief pause between the struggle on the ground and when the attacker returned to choke Jane, we do know the pause was extremely short—not even long enough for Jane to stand and reach the door to lock it. The mere fact that the attacker fleetingly stopped the attack, stepped away, then resumed a physical attack in the very same location does not establish an intervening event. Nor does Turner present any evidence that the second attack was caused by some fresh impulse. Nothing in the record suggests that Turner was triggered by some other force to come back into the same room and instigate a second attack. The acts occurred in the same location within a short time period, and the analyzed factors work against Turner's claim that this was a multiple acts case. Because this case did not contain multiple acts, no unanimity instruction was required.

Even if we were to find this were a multiple acts case, the State elected the act of choking Jane for the purpose of the charge of aggravated battery during its closing argument. The prosecutor said, "The battery? Oh, just that momentarily choking out around her neck. Eh, that's a battery." Our Supreme Court has considered the prosecutor's closing argument as the "functional equivalent" of an election by the State, thereby avoiding error. See *Moyer*, 306 Kan. at 361 (citing *State v. Dickson*, 275 Kan. 683, 696, 69 P.3d 549 [2003]).

And, even if we had found error in failure to give the instruction, reversal would not be warranted. Reversal is only necessary if we are "'firmly convinced that the jury would have reached a different verdict'" had the district court given a unanimity instruction. *King*, 297 Kan. at 980. But here, Turner's defense was a general denial—it simply was not him who attacked Jane. It was up to the jury, then, to decide the credibility contest. And in such instances, Kansas courts have not found a failure to instruct in multiple acts cases to be reversible error. *State v. De La Torre*, 300 Kan. 591, 599, 331 P.3d 815 (2014).

For these reasons, we find no error in the district court's failure to give an unrequested unanimity instruction in a non-multiple acts case.

THE DISTRICT COURT DID NOT ERR BY FAILING TO
PROVIDE THE LESSER INCLUDED OFFENSE INSTRUCTION

Turner argues next that the district court erred by failing to provide a lesser included offense instruction for reckless aggravated battery.

1. *Legal Standards Applicable to Lesser Included Offense Instructions*

When the giving of, or failure to give, a lesser included offense instruction is challenged on appeal, appellate courts apply the analytical framework for jury instruction

29

issues. See *State v. Gray*, 311 Kan. 164, 173, 459 P.3d 165 (2020). "However, if a defendant fails to object to the instructional error below, the clear error standard is applied to assess prejudice." *State v. Owens*, 314 Kan. 210, 235, 496 P.3d 902 (2021). As noted above, for a jury instruction to be clearly erroneous, the instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *Crosby*, 312 Kan. at 639.

2. *The lesser included instruction was legally appropriate.*

Turner argues because reckless aggravated battery, K.S.A. 2020 Supp. 21-5413(b)(2)(B), is a lesser severity level felony of aggravated battery, K.S.A. 2020 Supp. 21-5413(b)(1)(C), it is a lesser included crime as defined by K.S.A. 2020 Supp. 21-5109(b)(1) ("A lesser degree of the same crime."). So, Turner claims the lesser included offense instruction for reckless aggravated battery was legally appropriate. The State concedes as much.

The law supports the parties' claims. Reckless aggravated battery is a lesser included crime of aggravated battery, and Kansas law requires the trial court to instruct the jury on lesser included offenses where there is some evidence, viewed in a light most favorable to the defendant, that would reasonably justify a conviction of the lesser included offense. K.S.A. 22-3414(3); *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 (2018). This duty to instruct applies even if the evidence is weak or inconclusive. *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014). But this duty attaches "only when there is sufficient supporting evidence from which a rational factfinder could find that the events occurred consistent with the defendant's theory." *State v. Rutter*, 252 Kan. 739, Syl. ¶ 2, 850 P.2d 899 (1993).

30

So, when a defendant is charged with aggravated battery, a trial court must generally provide instructions for lesser included offenses, including reckless aggravated battery, provided there is some evidence that supports the lesser degree of the same crime. *State v. Green*, 55 Kan. App. 2d 595, 610-12, 419 P.3d 83 (2018); see *State v. Perez-Medina*, 310 Kan. 525, 535, 448 P.3d 446 (2019). Adopting the *Green* court's holding, the lesser included offense instruction for reckless aggravated battery was legally appropriate.

3. *The lesser included offense instruction was not factually appropriate.*

Finding a lesser included offense instruction was legally appropriate, we must also examine whether the instruction was factually appropriate using an unlimited standard of review of the entire record. *Holley*, 313 Kan. at 254. The lesser included offense instruction is factually appropriate if we would uphold a conviction for the lesser offense in the face of a challenge to the sufficiency of the evidence. *Martinez*, 317 Kan. at 171.

Turner argues, based on the record viewed in the light most favorable to him, this court would uphold a conviction for a reckless aggravated battery. He claims under K.S.A. 21-5202(c), if a finding of recklessness satisfies an element, the same element is also established by the finding of any higher degree of culpability, such as knowingly or intentionally. Turner also asserts even if there was some evidence of the attacker acting knowingly, it was not strong enough to negate any possibility that the attacker acted recklessly. He argues that an attacker could be unaware of inflicting great bodily harm, disfigurement, or death while choking another person with their arms. Instead, Turner claims, even if the attacker does not know such risks exist, the attack could still be a reckless conduct that could result in great bodily harm, disfigurement, or death.

As the State explains in detail, aggravated battery under K.S.A. 2020 Supp. 21-5413(b)(1)(C), which Turner was convicted of, is defined as "[k]nowingly causing

physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." The required culpable mental state is knowingly, which K.S.A. 21-5202(i) defines as:

> "A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes."

Reckless aggravated battery under K.S.A. 2020 Supp. 21-5413(b)(2)(B) is defined as "recklessly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." A person acts recklessly under K.S.A. 21-5202(j) "when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The State disagrees that Turner's actions could be considered reckless. Considering the attack undertaken by Turner—including the initial grabbing and pushing Jane into the closet, telling her repeatedly to "shut up" and saying, "This won't take long," running back into the conference room after leaving, and choking Jane with his arms against the wall—the State contends these actions must have been conducted knowingly and could not have been simply reckless.

32

But the State conclusively stated on appeal that the prosecutor elected the choking of Jane as the act which proved the crime of aggravated battery. As a result, we only consider whether the choking of Jane is supported by sufficient evidence which would uphold a conviction of the lesser offense of reckless aggravated battery.

Even reviewing the record in the light most favorable to Turner, we cannot reasonably conclude how a conviction of reckless aggravated battery could stand given the evidence presented in the record. For Turner to prevail on this argument, there must be some evidence showing the attacker acted not with awareness or intent, but only with a lesser degree of mental culpability—a reckless disregard of the risk of causing harm. But the record simply lacks any such evidence that Jane's attacker consciously disregarded a substantial and unjustifiable risk that harm would reasonably follow. Instead, her attacker appeared to move quite intentionally to the point of choking her to where she could not breathe. In fact, in the evidence presented at trial, there were two options presented to the jury: one in Jane's testimony, in which her attacker acted very purposefully, and the second option, in Turner's testimony, where there could be no showing of conscious disregard of a substantial risk that resulted in bodily harm because Turner denied attacking Jane entirely.

A reasonable jury would not have convicted Turner of reckless aggravated battery, and for these reasons, the lesser included offense instruction was factually inappropriate. Because it was factually inappropriate, the district court's failure to provide the instruction was not error.

## THE PROSECUTOR DID NOT COMMIT REVERSIBLE ERROR IN CLOSING ARGUMENT

In his final substantive error argument, Turner claims the prosecutor improperly stated his opinion and inflamed the passions of the jury during closing arguments.

1. *Legal Standards Applicable to Claims of Prosecutorial Error*

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, we "decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. Then, "[i]f error is found, [we] must next determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109. We examine prejudice under the traditional constitutional harmlessness standard of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). That is, any prosecutorial error is harmless "if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 109. Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. 305 Kan. at 114.

We apply these principles to each of the two scenarios in which Turner claims error occurred.

2. *The prosecutor did not improperly state his personal opinions.*

Turner challenges two comments made by the prosecutor during closing arguments on the basis that the prosecutor improperly stated his personal opinions. First, Turner contests the following comments:

> "I told you . . . during opening statement what the State believed the evidence would show, and it is time for me to kind of summarize and tell you what in fact *I think* the evidence did show. . . .

. . . .

　　　　". . . . I believe [Mary] testified first she heard the chime of the gate go off. *I don't think* that [Jane] said she heard that." (Emphases added.)

He argues it is improper for prosecutors to tell the jury what they think of the evidence because it crosses the line from discussing the evidence to introducing their personal opinion.

Prosecutors are generally afforded wide latitude in crafting closing arguments to address the evidence presented during trial. *State v. Watson*, 313 Kan. 170, 176, 484 P.3d 877 (2021). When determining whether the prosecutor's statement falls outside the wide latitude given to the prosecutor, the appellate courts do not analyze the statement in isolation but consider the context in which the statement was made. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). "Often the line between permissible and impermissible argument is context dependent." *State v. Martinez*, 311 Kan. 919, 923, 468 P.3d 319 (2020).

These comments Turner challenges were made shortly after the prosecutor began his closing arguments, and the prosecutor immediately followed the comments by summarizing the evidence presented during trial. In *State v. King*, 308 Kan. 16, 31, 417 P.3d 1073 (2018), our Supreme Court acknowledged that phrases such as "'I think'" may be used as mere verbal tics, used to "'advance an idea for the jury's consideration,'" but the court warned prosecutors to use less subjectively loaded phrases, such as "'the evidence shows,'" or "'I submit.'" Although the prosecutor here could have accomplished the same goal without using the phrase "I think," his expressions did not portray his personal opinions of Turner's guilt; instead, they were figures of speech used to describe the prosecutor's submission of the evidence. We find no error in the prosecutor's use of "I think" in this context.

Next, Turner argues that the prosecutor ended his closing statement with an improper comment attacking Turner's credibility by making the following comment:

"You know, in the end this comes down to one thing. Do you believe [Jane] and the evidence? Or do you believe the 'Deuce' story that was presented to you yesterday? It's that simple. And yes, you have to use your common sense and your life experience when you're evaluating the testimony of all the evidence, including the defendant's evidence. He told you yesterday he was a hustler, *he's out there hustling. Still hustling. One last time*." (Emphasis added.)

Turner argues the emphasized commentary essentially accused him of hustling the jury through his testimony, and the comments were an improper attack on his credibility.

Turner is correct that prosecutors are prohibited from expressing their personal opinions on the credibility of the defendant or witnesses during trial. *Peppers*, 294 Kan. at 396. This is "because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case. The determination of the truthfulness of a witness is for the jury." *State v. Akins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014). A prosecutor is also prohibited from stating a personal opinion regarding the ultimate guilt of the defendant. *King*, 308 Kan. at 30. Yet a prosecutor is permitted to craft arguments that draw reasonable inferences from the evidence. *Lowery*, 308 Kan. at 1207. And a prosecutor may argue the evidence demonstrates a defendant is guilty. *State v. Mireles*, 297 Kan. 339, 368-69, 301 P.3d 677 (2013).

During his testimony, Turner stated multiple times that he was trying to "hustle" the night of the incident. Through his testimony, Turner explained he was employed intermittently, and held "side jobs, and stuff [he] could hustle." On the day of the incident, he "was at a bus station almost all day trying to find some hustle to get high." He explained that "to hustle" meant a "way to make some money." Instead of a comment on Turner's credibility, the prosecutor's comment was a proper inference from Turner's

own testimony about what he was doing on the day of his arrest. Reading the comment in the context of the prosecutor's closing argument and in light of Turner's own testimony, one last hustle could have been when Turner went inside the Center, perhaps to try one more time to make money. That is a more reasonable inference, in light of the evidence, than Turner's negative connotation from the statement. We find no error in the prosecutor's comment.

3. *The prosecutor's comments did not inflame the passion of the jury.*

Turner also argues the State committed prosecutorial error during closing arguments by inflaming the passions of the jury. He challenges two statements. First, he claims the prosecutor improperly commented on the ongoing effect of the attack on Jane, which had nothing to do with the elements of the case. During closing arguments, the prosecutor told the jury, "We are here, we are glad that [Jane] was able to fight back long enough and hard enough to repel that attack. Yes, it's traumatic and she'll have to live with that . . . the rest of her life, but better than the alternative." Second, he challenges the prosecutor's comment during rebuttal asking the jury to find Turner guilty "because justice demands [it]." During the State's rebuttal argument, the prosecutor told the jury:

> "Do the right thing. Do it not because I'm telling you. *Do it because justice demands, and it demands it* in this case ladies and gentlemen. This isn't a bad cop, bad investigation, lying witnesses case. That's not what this is. This is just what happens. This is the real world." (Emphasis added.)

The State argues the prosecutor's comments about Jane properly stated the evidence presented and did not appeal to the jury to improperly sympathize with her. The State also claims the prosecutor's rebuttal comments, "because justice demands," was a general appeal for justice, not a call for sympathy to find justice for Jane.

37

Generally, Kansas courts have found prosecutors must not make comments asking the jury to empathize with a victim or victim's family, or comments intended to inflame the passions of the jury. See *State v. Holt*, 300 Kan. 985, 992-93, 336 P.3d 312 (2014); *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). For example, in *State v. Henry*, 273 Kan. 608, Syl. ¶ 8, 44 P.3d 466 (2002), our Supreme Court found that a prosecutor's remarks about a mother's grief were not relevant, were improper, and were clearly intended to inflame the passion and the prejudice of the jury. The *Henry* court held that such comments substantially affected the defendant's right to a fair trial and amounted to prosecutorial misconduct. 273 Kan. at 641. Similarly, our Supreme Court held that prosecutor's comments appealing to a parent's grief of losing their child was clearly intended to inflame the passion and prejudice of the jury. 273 Kan. at 641. In *State v. Olsman*, 58 Kan. App. 2d 638, 658, 473 P.3d 937 (2020), our court held that prosecutor's comments appealing to sympathy for the victims were erroneous because the comments distracted the jury's attention from its duty as a fact-finder. And in *State v. Maybin*, 27 Kan. App. 2d 189, 199, 2 P.3d 179 (2000), this court found that the prosecutor's use of the word "predator" was designed to inflame the passion and prejudice of the jury and amounted to prosecutorial misconduct.

But the clear distinction here is that while the cases above elicited the jury to empathize with the victim, the prosecutor's comment here did not have the same effect. The prosecutor's first comment merely alluded to the fact that Jane was traumatized by the attack that night. Earlier during the trial, Jane herself testified she was mentally traumatized. The prosecutor's comment may not have been easy to hear, but it did not deviate from the evidence and does not render the comment erroneous. A prosecutor "may indulge in impassioned bursts of oratory and may use picturesque speech as long as he or she does not refer to facts not disclosed by the evidence." *State v. Rodriguez*, 269 Kan. 633, 643, 8 P.3d 712 (2000). Much of the relevant evidence in criminally violent cases, by nature, tends to be inflammatory to some extent.

38

Similarly, the prosecutor's closing comment during rebuttal did not rise to the level of inflaming the jury's passion. Our Supreme Court has refrained from drawing a bright line when distinguishing between a general appeal for justice and an appeal for the jury to do justice specifically for the victim. *State v. Flack*, 318 Kan. 79, 117-18, 541 P.3d 717 (2024), *petition for cert. filed* September 26, 2024. But the court has consistently found that "statements regarding justice for the victim—as opposed to justice for the citizens of Kansas—fall outside the bounds of permissible argument." *Holt*, 300 Kan. at 998. On the contrary, our Supreme Court has held that a prosecutor's general statement to the jury to "'do the right thing'" was "more aptly characterized as a general appeal for justice that was not explicitly tied to the community or the victim." *State v. Britt*, 295 Kan. 1018, 1030-31, 287 P.3d 905 (2012).

Here, the prosecutor's comment falls more in line with the latter. Nowhere in the prosecutor's comments did he divert the jury to sympathize with Jane, personally. The statement, "because justice demands," was a generic appeal for justice.

For these reasons, the prosecutor's statements did not attempt to improperly inflame the passions of the jury. Turner fails to show the prosecutor's comments fell outside the wide latitude afforded to prosecutors during closing arguments. As a result, the prosecutor did not commit reversible error.

CUMULATIVE ERROR DID NOT DEPRIVE TURNER OF A FAIR TRIAL

Finally, Turner argues that his conviction must be reversed and remanded for a new trial because cumulative errors deprived him of a right to a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan.

321, 345, 446 P.3d 472 (2019). In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. 310 Kan. at 345-46. If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017). Yet when an appellate court finds no errors exist, the cumulative error doctrine cannot apply. *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020). Even a single error cannot support reversal under the cumulative error doctrine. *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019); see also *Butler*, 307 Kan. at 868 (2018) (citing both no error and single error rules).

Specifically, Turner claims the cumulative effect of the jury instructional errors, even if harmless individually, deprived him of a fair trial. The State rebuts Turner's argument, stating that the cumulative error analysis should not apply to jury instructional issues because under K.S.A. 22-3414(3), instructional error issues raised for the first time on appeal must be reviewed for clear error. The State supplemented its argument through a notice of additional authority letter, under Supreme Court Rule 6.09 (2024 Kan. S. Ct. R. at 40), which correctly captures our Supreme Court's recent holding that "unpreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis because K.S.A. 2022 Supp. 22-3414(3) limits a party's ability to claim them as error." *State v. Waldschmidt*, 318 Kan. 633, 634-35, 546 P.3d 716 (2024). The court held that prior caselaw suggesting otherwise is disapproved. 318 Kan. at 662. Because none of Turner's claimed jury instructional errors were found to be clear errors, we cannot include them in a cumulative error analysis.

This leaves only one error:  we found the district court erred by admitting hearsay evidence, but we also found the error was harmless. This single, harmless error cannot

support reversal. See *Ballou*, 310 Kan. at 617. The cumulative error analysis does not apply.

Affirmed.